[Civ. No. 9997.   Third Dist.   Mar. 9, 1962.]

LOU COTE, Plaintiff and Appellant, v. RAYMOND EARL ROGERS et al., Defendants and Respondents.

Daniel S. Carlton and Richard J. Asbill for Plaintiff and Appellant.

Glenn D. Newton and William W. Coshow for Defendants and Respondents.

PEEK, P. J.—Riviar Cote was killed as the result of a collision between the truck he was operating and a truck then being driven by defendant Rogers. Decedent's widow now appeals from the adverse judgment in the unlawful death action which she thereafter instituted, and from the order of the trial court denying her motion for a new trial.

Her sole contention is that the conduct of defendants' counsel was so prejudicial as to deny her a fair trial. It is our conclusion that the conduct of which she complains was

such as to compel a reversal of the judgment and the order denying her a new trial.

The facts pertinent to our conclusion show that the collision occurred at approximately 8:30 p. m. on Highway 99, a four-lane divided highway, a short distance south of the City of Redding. The truck being driven by Rogers was of maximum length (60 feet) and loaded with lumber. He was proceeding in a southerly direction. Because of his unfamiliarity with the locality, he had driven past the intersection where he had intended to turn. As he was attempting to make a U-turn at a crossover, or opening, in the divider between the traffic lanes in order to return to his destination, he was struck by defendant. The radius necessary to turn a truck of that size was such that defendant was compelled to block both of the southbound lanes, all of the inside northbound lane and all but a few feet of the outside lane. At the time of impact his truck was at a 45-degree angle across the northbound lanes of the highway and, apparently, with its left wheels hard against the cement curb of the divider. The decedent Cote was driving a loaded semi-trailer truck in a northerly direction. Skid marks showed that immediately prior to the collision he had turned from the outside lane in which he was driving to the inside lane. There were, in fact, two impacts between the vehicles. The first apparently caused the decedent's trailer to break loose and jackknife; the second occurred when the trailer swung around and so hit the cab of decedent's truck as to telescope it against defendants' truck, killing Cote immediately.

The major argument at the trial related to a flashlight which was found crushed between the brake pedal and the floorboard of decedent's truck. Defendants' contention throughout the trial was that the flashlight was not properly secured in the cab of decedent's truck, thereby allowing it to get under the brake pedal and making it impossible for him to brake his truck. Plaintiff's reply to this contention was that the flashlight could only have been there by reason of the force of the first impact.

■■■ The primary contention on appeal relates to the actions of defense counsel in attempting to get before the jury an article concerning the accident which appeared several months previously in the California Highway Patrolman, a magazine published by the Association of California Highway Patrolmen, and in having the inadmissible article published in a local newspaper on the afternoon of the second

day of the trial and broadcast that evening over a Redding radio station.

The article, as it appeared in the magazine, carried pictures of the accident and stated that the cause thereof was "improper care of loose equipment in cab of truck." The newspaper story, which also contained this quotation, was prominently portrayed under a three-column headline which stated: "JURY CHOSEN TO HEAR $71,500 SUIT" and was as follows:

"Lawyers yesterday began to introduce evidence in the case of a widow who is suing to collect $71,500 for the Oct. 3, 1958, traffic death of her truck driver husband.

"Mrs. Lou Cote, widow of Riviar Joseph Cote of Richmond, asks $70,000 damages and $1,500 funeral expenses from truck driver Raymond Earl Rogers of Mesa, Ariz. Her suit charges that Rogers was the agent of trucking company owner Ernest R. Leoni, the Hammon Wholesale Lumber & Supply company, Inc., and Ronald E. Grisham, all of Arizona.

"Last October, Cote crashed into a truck driven by Rogers as Rogers attempted a U-turn on Highway 99 just north of the Oak Grove tavern.

"The crash spewed lumber, barrels of oil and gasoline about the highway and crushed Cote to death in the cab of his truck. In April the CHP magazine, California Highway Patrolman, carried pictures of the accident and said the cause was 'improper care of loose equipment in cab of truck.'

"Superior Court Judge Harold Underwood of Trinity county is trying the case in Shasta county superior court.

"Judge Underwood disqualified himself on a Trinity county case this week and exchanged court rooms with Judge Richard B. Eaton for the week.

"Jurors hearing the case are: Mrs. Ruth E. Miller, Mrs. Ruth Jamiesen, Mrs. Katherine I. Sherman, Mrs. Marilyn Johnston, Mrs. Lois Busby, Mrs. Orpha L. Meeker and Mrs. Marie M. Rickaby, all of Redding; Mrs. Alma F. Moore, Mrs. Estelle Hedstrom and Mrs. Viola M. Pickard, all of Central Valley; Mrs. Eva R. Giessner of Cassel and David G. Staup of Anderson."

The magazine article first came into the trial during the cross-examination by defense counsel of Officer Nielson of the Highway Patrol, who was at the scene of the accident and who was the second witness called by plaintiff. The officer was asked if he was acquainted with the publication; if its proceeds went to the widows' and orphans' fund; and if it repro-

duced photographs along with discussions relative to the cause of accidents. He was then asked, did the magazine ". . . use three of the photographs that have previously been introduced as exhibits and reproduce those in the magazine in regard to this particular accident?" Over the objections of plaintiff's counsel the witness was allowed to answer the question, stating that he did not know the exact number of pictures that were reprinted, but he did know that some of this particular accident were used. He was then asked if he had a copy of the magazine with him, and following his answer that he did not, defense counsel then asked, "Well, I will show you a document and ask if you could identify that, please?" Again, counsel for plaintiff objected and after a short discussion concerning its admissibility the matter was taken up in chambers.

During the course of that discussion, defense counsel made an offer of proof that it was the usual practice of the highway patrol association, as experts, to determine the cause of accidents; that, therefore, the article was admissible as expert testimony; and that it was a public or semipublic document and as a matter of public record it came within the exceptions to the opinion rule and the hearsay rule. At the conclusion of the discussion the court sustained plaintiff's objection that it was hearsay and denied the offer.

On the following day, the story in question appeared in the Redding Record Searchlight, a daily newspaper published in that city, and was also broadcast over a Redding radio station that same evening.

When plaintiff's counsel learned of the publication he immediately contacted the reporters who had written the story. At first, the reporters declined to reveal the source of their information on the ground of privilege. After the trial, however, they changed their minds, elected not to claim privilege, and from the depositions which were thereafter taken, the following appears: that William Botwright, Jr., was the city hall reporter for the newspaper; that prior to the trial he had been contacted by Attorney Coshow, who stated that there might be an interesting angle in a lawsuit which was going to trial that week; and that the California Highway Patrol magazine had reported the accident and it might be a newsworthy aspect of the lawsuit. Botwright informed Coshow that he was not covering the courthouse beat, but he would pass it on to the reporter who was, and Coshow then stated that he was

going to attempt to introduce the magazine article into evidence at the trial.

The second reporter, Hanna, who wrote the story, testified that his attention was directly called to the magazine article by defendants' counsel and indirectly by his fellow reporter; that Botwright mentioned the article either on the first day of the trial or several days prior thereto; that he did not contact Coshow; that Coshow contacted him in the courtroom during a recess on the first day of the trial; that Coshow showed him a copy of the April issue of the magazine; that the quote used in his subsequent newspaper story was the same as appeared in the magazine; and that during the discussion he had with Coshow, the latter informed him that he was intending to try to introduce the article the following day, although, as he said, the material might not be admitted in evidence.

In support of his actions, defense counsel in his brief on appeal comments that some of the cases cited by plaintiff are old and epitomize the ''archaic concepts'' concerning such conduct, and that in more recent years the courts have become more liberal in their disposition of like issues. He further seeks to rationalize his conduct on the basis that the record contains no evidence to indicate that he attempted to place improper material before the jury; that while he did give information to the press, it was at a time when it was uncertain as to whether or not the material would be admissible in evidence. He further argues that as a part-time city attorney his political position was ''often dependent upon a good relationship with the only newspaper in the community. The more items of newsworthy interest that a person in such a position can furnish to the press the better the relationship. Presumptively juries do not read, nor are they influenced by articles in newspapers.'' He then denies that it was he who sought to place the article in the newspaper, stating that it was not until he was asked by one of the reporters before the trial for a newsworthy story that he mentioned the article which appeared in the magazine.

Also in defense of his action, he states that he did not attempt to present either the magazine article or the newspaper article to any of the jurors. He concedes that, ''Undoubtedly there are those who would believe that the conduct of defense counsel was not above reproach . . .'' In addition, he argues that claimed misconduct must be called to the attention of the court at the earliest possible time, otherwise

any objection thereto is waived, and the record in the present case shows neither timely objection nor motion for mistrial.

It should further be noted that plaintiff in her brief states (and it is not denied by defendants' counsel) that throughout the entire time defendants' counsel was attempting to have the magazine article received in evidence he was holding in his hand and gesturing with what purported to be the particular issue of the magazine containing the article relative to the accident.

Certainly defense counsel knew that the article, as such, was not admissible in evidence and that his continuing reference to it, while holding a copy of the magazine in his hand, was calculated solely to impress the jury that here was a statement by a highly respected law enforcement agency of the State of California whose province it was to investigate the very question in issue, but because of some obscure, highly technical rule of evidence unknown to it, the jury was being precluded from the benefit of expert information which would have decided the very point in issue before it.

Here, as in *People* v. *George,* 72 Cal.App. 124, 131 [236 P. 934], where the actions of defendants' counsel were ". . . of such a character as to have produced an effect which, as a reasonable probability, could not have been obviated by any instructions to the jury, the absence of such assignment and request will not preclude the defendant from raising the point on appeal [citing cases] ; . . . such cases furnish ground for reversal; and where it fairly appears, as here, all of the evidence considered, that the irregularities complained of in all probability largely influenced the jury in arriving at their verdict . . . such result is a miscarriage of justice.''

While it is true that none of the jurors admitted to having read the newspaper story, it would seem equally true that a juror who had done so would be extremely reluctant to publicly admit such a fact. However, the record does show that the foreman did in fact read the article, whether at the time of its original publication or later does not clearly appear, although on his *voir dire* he stated he had read only a newspaper account.

It has been stated that ''If . . . a newspaper read by jurors contains matter in connection with the subject of the trial that would be at all likely to influence the jurors in the performance of their duties, a presumption of improper influence arises and a new trial will be granted, without requiring

the [offended party] to show that harm was in fact done to his cause." (36 Cal.Jur.2d, New Trial, § 48, pp. 198, 199; see also *People* v. *Stokes*, 103 Cal. 193 [37 P. 207, 42 Am.St. Rep. 102].) It also has been stated that "Where jurors read articles or interviews in newspapers which were evidently published for the purpose of influencing their verdict, especially an article inspired by the successful party or by some one acting for him, or which have been prejudicial, or which may reasonably be presumed to have influenced their verdict, a new trial may be allowed." (66 C.J.S., New Trial, § 52, p. 166.)

It would be extremely naive and the closing of one's eyes to the facts of life to conclude that the jury neither saw nor read the article which appeared in the local newspaper. It is stated in the briefs that Shasta County has a population of approximately 50,000 people and that the circulation of the newspaper was in the neighborhood of 15,000. Thus, the paper reached virtually all of the families in the county. It probably could be said that it is a matter of common knowledge that the smaller the community the greater the prominence and importance of newspaper stories which name or refer to persons residing in the area served. Here the article in question received prominent attention with a three-column heading with the names of all of the jurors included in the body of the story. In this regard, the comment of plaintiff's counsel appears quite apropos: ". . . defense counsel might just as well have prepared a handbill containing this inadmissible evidence and taken it around to the homes of jurors."

In the recent case of *People* v. *Brommel*, 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845], the district attorney, during the course of the trial, released to the press copies of confessions and admissions of the defendant before they were admitted into evidence by the court and even before they had been made available to defendant and his counsel. The court concluded, "The obvious impropriety of this conduct is only emphasized by the fact that we have now determined that these statements were inadmissible against defendants on the trial. Prosecuting officers owe a public duty of fairness to the accused as well as to the People and they should avoid the danger of prejudicing jurors and prospective jurors by giving material to news-disseminating agencies which may be inflammatory or improperly prejudicial to defendant's rights." (P. 636.) The pointed comment of the court in the *Brommel* case is not limited to the conduct of attorneys in criminal

cases. Most certainly the political well being of an attorney and his desire for favorable relations with the press should never be allowed to transcend his duty to the court, to the public, and to opposing litigants to conduct litigation fairly so as to preserve the integrity of our judicial system.

Numerous other contentions are made by plaintiff relative to additional misconduct on the part of defendants' counsel and errors in the admission or rejection of evidence. However, since we conclude that the actions of defendants' counsel which form the primary contention of plaintiff compel a reversal, it becomes unnecessary to discuss the other matters raised by plaintiff. In the event of a new trial, such errors may not be repeated.

The judgment is reversed.

Schottky, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied May 2, 1962. Schauer, J., was of the opinion that the petition should be granted.