[Civ. No. 10051.   Third Dist.   July 26, 1962.]

THE BOARD OF TRUSTEES OF THE LASSEN UNION HIGH SCHOOL DISTRICT, Plaintiff and Respondent, v. JACK OWENS, Defendant and Appellant.

Albert M. Bendich and Marshall W. Krause for Defendant and Appellant.

Joseph Genser as Amicus Curiae on behalf of Defendant and Appellant.

James E. Pardee, County Counsel, Paula Tennant, District Attorney, Long & Levit, Bert W. Levit and J. Ronald Trost for Plaintiff and Respondent.

Johnson & Stanton, Gardiner Johnson, Thomas E. Stanton, Jr., and Marshall A. Staunton as Amici Curiae on behalf of Plaintiff and Respondent.

PEEK, P. J.—This is an appeal from a judgment permitting plaintiff to dismiss defendant and to terminate his employment as a permanent teacher in the Lassen Union High School District on the grounds of "unprofessional conduct." (Ed. Code, § 13403, subd. (a).)

On May 13, 1959, charges were formulated by plaintiff alleging that causes existed for defendant's dismissal. After the written notice of plaintiff's intention to dismiss him was received, defendant demanded a hearing upon the charges in accordance with the provisions of sections 13403 et seq. of the Education Code. Plaintiff thereupon elected to file this action asking the court to inquire into the charges, determine whether or not they were true and, if so, whether they constituted sufficient grounds for defendant's dismissal. (Ed. Code, § 13412.)

Although the pretrial statement set the issues in dispute as to (1) whether the publication by defendant of five letters in the *Lassen Advocate* constituted unprofessional conduct or evident unfitness for service, and (2) whether the contents of the letters were false and as such constituted dishonesty, the superior court made no findings on, nor did it mention, the dishonesty or evident unfitness charges. The court found that the allegations in the letters were "unwarranted," "unfounded," and "unsupported by the evidence," and that the publication of the five letters constituted unprofessional conduct of a degree justifying dismissal.

150

The purport of defendant's contention on this appeal is that he has been punished solely for the expression of political ideas critical of education generally, and in Lassen County particularly, and that such is not a constitutional basis for dismissal, either under the guise of unprofessional conduct or on any other basis. Defendant further contends that inasmuch as the "warrantedness" of expressed opinions is an inquiry exceeding the court's constitutional power to adjudicate, any inquiry into the sufficiency of the evidence to support the findings is irrelevant.

We do not entirely agree with defendant's reasoning but for reasons later to be expressed, we hold that defendant's conduct under all of the circumstances presented does not constitute unprofessional conduct of a nature justifying dismissal. Furthermore, the record does not support dismissal on the grounds of dishonesty and evident unfitness. However, there would appear to be no reason to elaborate on this point, since no findings were made on these charges and no discussion was directed thereto at the trial.

Since the factual circumstances are of particular importance in a case of this nature, they will be set out at length.

Defendant was in his eighth year of teaching and was employed by the Lassen Junior College when the charges were filed against him. He had taught in both the Lassen High School and the Junior College for the preceding five years and had attained tenure in his position. All of his teaching experience was in Lassen County, during which time he had been active in problems relating to education and the teaching profession.

For example, he was instrumental in the organization of the local chapter of the California Teachers Association (hereinafter referred to as the CTA); he had served as president of the Susanville Secondary Teachers Association (hereinafter referred to as the SSTA) for a period of two years; he had served for three years on the Board of Directors of the CTA Northern Section; and he had served as chairman of the local CTA chapter's professional relations committee.

The record indicates that for some time defendant had been critical of the teaching conditions in the district. In 1957, while president of the SSTA, he presented a list of proposed improvements at a meeting of the board of trustees. Defendant testified that at the meeting the representatives of the association were greeted with a great deal of hostility, and that shortly thereafter he was being considered for dis-

missal. A member of the board of trustees stated that the 1957 meeting had been quite cordial and the trial judge, in his memorandum opinion, accepted this testimony. It is undisputed that some of the improvements suggested by the association in 1957 were accepted by the board. However, it appears that during that year a number of teachers left the district because they thought that the efforts of the SSTA had been a failure. The board members conceded at the trial that the teacher turnover problem had been troublesome. Additionally, it appears that many of the points raised by defendant had been the source of comment among educators in some of the major universities of this state; that editorials had appeared in large metropolitan newspapers; and that the Citizens Advisory Commission on the Public Education System had recommended many of the proposals suggested by defendant.

The professional relations committee of the SSTA strongly recommended to the board that defendant be given a contract for his tenure year. Although the board replied that it would accept recommendations on personnel matters only from the administrators, defendant was given his tenure contract.

There is nothing in the record indicating the nature of defendant's relationship with the board, or his other extracurricular activities regarding education in Lassen County, until December 24, 1958. On this date defendant wrote a letter which appeared in the *Lassen Advocate*, a newspaper of general circulation in Lassen County, announcing a forthcoming series of discussions during the following three months on education in Lassen County, which would be sponsored by the Public Affairs Forum.

The Public Affairs Forum was apparently a "town meeting" type of gathering which had been founded by defendant at some undisclosed date. Prior to the education issue, it had explored various political questions and such problems of local interest as water fluoridation at the specific request of the city council. Various Lassen County citizens, including teachers, were active in the forum presentations.

The December 24, 1958, letter, addressed to the local newspaper and signed by defendant, was critical of local educational conditions, and urged a public turnout to discuss the matter. Although this letter was not included among the five which ultimately constituted the basis of the dismissal charges against defendant, it was not unnoticed by the board. Immediately upon the appearance of the December 24 letter, at the

request of the president of the board the Lassen school administrators called in a CTA representative for "advice." The results of this meeting are not of record. However, on January 10, 1959, by the time defendant had written two letters, neither of which was listed in the statement of charges later filed against him, the CTA ethics commission met with defendant in an effort to have him stop his letter writing; but, according to the commission, "Mr. Owens made known that he planned to continue his newspaper article and the Public forum knowing full well that a group such as ours could never go along with him."

On February 4, 1959, defendant published a letter, which was the fifth he had written, but the first to be ultimately included as a basis of the charges later filed against him.[1]

The CTA representative again met with the board on February 25, 1959, to discuss the situation. It was suggested that the board ask defendant to appear before it, thrash the matter out, and *stop the letters*. This idea was not adopted. Although defendant apparently had never approached the board with his grievances at any time between the inauguration of the letter-writing campaign and the trial, nor had he been requested to do so, he did, on February 5, invite the board to participate in the education forums. However, in its letter of *February 13* declining this invitation, the board commended the "very American principle of the Public Forum and the very great local interest it has inspired," and thanked defendant for his "kind" invitation.

---

[1] "Wednesday, February 4, 1959 PURPOSEFUL EDUCATION To the Editor: The teacher is the best example, that I know, of the possibilities of 'purposeful education'—education subtly done for a particular purpose with scant regard for truth.

"(The term 'teacher' does not include educators who make up the personnel in the state department of education, district and county school administration, and college and university education departments.)

"Mr. Frank Lindsay, director of the state department's bureau of secondary education, was asked by the California Citizen's Commission on Education how he would go about the business of rating a high school.

"Mr. Lindsay replied that he would visit the boys' toilet and the library, question the janitor and bus driver, but implied that he didn't trust the superintendent. (Incidentally, superintendents as a group call themselves 'teachers' when it is convenient to do so.)

"Mr. Lindsay did not note the existence of the classroom thing—the teacher.

"Mr. Conner, also of the state department of education, recently did the educators' 'Jargon song' (always done to obscure and confuse) before the State Citizen's Commission on Education.

"Conner is the top authority of the State Central Committee for changing the social studies curriculum. That Committee begot com-

mittees which begot committees and finally summer session workshops where teachers on the leash, as usual, could offer 'constructive suggestions' about a hodge-podge program which had probably already been decided upon.

"At that workshop some classroom teachers with doubts about the proposed changes were either seduced by grades, maneuvered, or told to shut up. Most of the teachers there recognized the true nature of the situation but are silent.

"The instilled belief, backed by salary dollars, is that a promoted teacher becomes an administrator. Yet any discerning person, not ashamed to admit the results of his observations, can plainly see that teaching and administration are two entirely different occupations. What is the position of the able teacher who wants to teach not administrate?

"Teachers in excess of 100,000 pay $22 per teacher per year to belong to the California Teachers Association. The record indicates that this organization is extremely effective in changing California's constitution and in securing appropriate laws.

"The California Teachers Association also has a legally accepted Ethics Commission which quietly covers nasty situations and controls junior administrators and classroom teachers where the power of hiring and firing fails at the local level.

"The teachers sit on committees and are counted for publicity purposes, but 'educators' sit at the controls making the world safe for their kind. Teachers are given such dubious half crumbs as tenure, minimum salary laws, and insurance programs.

"Teachers have their voices 'given' in support of local school programs which they admit privately are absurd and deteriorating. At a personal risk, some quietly teach in unaccepted ways or public education would be much further in the mire.

"Teachers are publicly, therefore, led to stamp and make their own chains and those for others.

"As undergraduates, teachers are required to take a number of education courses, the content of which is junk and repetition. We return to college from time to time at great personal (and taxpayer) expense to take more of the same required trash and repetition! We spend time that could be used to take academic courses that would help us unsaddle ourselves eventually.

"Now we teachers are about to lend our passive voices to increasing the misery. A teacher certification change is being pushed through the usual organizations, following the usual process of 'taking' the teachers and the public.

"In summary, I offer for consideration the ethically and intellectually castrated American, first echelon—the teacher in the classroom.

"In the past our only solution for the above problems has been to run or bow, and conditions have become worse.

"Now the public desparately needs us. We have a moral obligation as citizens and as professionals to that public.

"Let us not run from the California Teachers Association and our districts of employment. Stand and reform! Help wrest the power of decision from the few (the California Teachers Association and the districts) and give it to the many.

"We must do this now or forever be the ethically and intellectually altered American or Russian national as the force of unhappy circumstances may dictate.

"Now is the time for us to attempt to stand and be the professionals that the 'educator' for propaganda reasons has said that we are.

"Stand with dignity and strength before and with the public so

The next letter deemed "unprofessional" was written on March 4.[2]

On March 10, a meeting of the Lassen Junior College faculty was called by the acting director of the college to question defendant on the exact nature of his grievances. The acting director testified that the group was not satisfied with defendant's answers, but decided not to take any group action other than to publish a letter in the *Lassen Advocate*, dated March 18, to indicate that defendant was not representing the faculty in his letter-writing campaign. Two more letters, later adjudged "unprofessional," followed on March 11 and March 18. While the letter of March 11 is set forth in full, only

that we may have the chance to be with dignity and courage in the classroom.

"Thus we may teach.

"Jack Owens, Teacher

"Lassen Junior College"

[2]"Wednesday, March 4, 1959  CHANGES NEEDED  To the Editor:

"The Lassen Union High School and Junior College administration and a part of the board of trustees have well illustrated a disease that is rapidly sinking American public education, California first, that of autocracy. These people have had and believe that they still have absolute and final authority over their 'empire,' the high school and junior college. That time is no more.

"They have created, mainly through ineptness and indifference, a mess obviously and primarily beneficial and desired only by themselves, if by anyone. They have created and permitted situations and conditions in those schools that does gross violence to the dignity and decency standards of many teachers and students. They have created and maintained a situation in which the possibility of reasonable education is seriously hampered. How can teachers teach and students learn under conditions distasteful and shameful to both?

"The public is now seriously and justifiably questioning the type of school and educational situation that these people insist on protecting. The administration and some of the board members are obviously and naturally reluctant to meet the public in a space large enough to contain all those people of Lassen County who obviously wish to ask questions and who will expect straight and complete answers; large groups are more difficult to bluff and confuse. Neither does the Forum have an 'executive session' into which the board and administration can retreat when questions seek revealing answers; nor does the Forum permit rudeness as a means of squelching persons who ask questions. The administration, and probably some members of the board, are fully aware that pertinent questions would be asked for which they have no decent answer.

"The need for reasonable changes is a desperate one and the public, who really own the schools, have a right to question even those who have been a part of the failing school situation. This is the only way to make changes based on reason.

"With this in mind, let us go forward then to the March 20 Forum on the High School and Junior College District dedicated to action guided by judgment and tempered with reason and firmness,

"Jack Owens"

portions of the letter of March 18 appear in the record before us.[3]

[3]"Wednesday, March 11, 1959    CTA ORGANIZATION    To the Editor:

"My efforts to help effect changes in public education that are desired by both teachers and the public led me into the ranks of the California Teachers Association and then into office in that organization. I have served as a member of the board of directors for the CTA Northern Section during the past three years and was recently reelected for another three year term. Most of the people on this board and in other key positions are educators—administrative people and education professors.

"For us lower echelon people (teachers), the CTA channels of communication are as clogged and confused as they are for the public in the local school districts; efforts to reform are simply ignored and the energy of reformers is dissipated with 'side projects.' My energy and time was used in among other things, organizing a credit union for the approximately 9,500 school people of the CTA Northern Section.

"The entire CTA is a powerful thing; it has a membership of over 100,000 and an annual budget of over $2,200,000. The efforts of its lobbyists are extremely effective in the passage of taxes and other laws; it can and does elect and defeat candidates for public office. It also quickly and almost automatically protects and assists the administration in any local district where difficulty with the public or subordinates is encountered; if two administrators quarrel the senior one is supported.

"Thus, through the CTA and other organizations, local and public control of education has been practically eliminated; the educator is in charge of hiring and firing and he pretty much controls policy (if any) and curriculum. My present campaign was designed to show among other things the CTA in action.

"After my letters to this paper were started the local educators, as expected, sought and obtained CTA assistance. The local teachers association (people who can be fired locally) were urged to investigate; Mr. Howlett, CTA field man whose home office is in San Francisco, was called in and met secretly with the administration and board. He recommended, apparently early in February, that I be dismissed, for unprofessional conduct, probably because of my public criticism of education. Plans have subsequently been made to accomplish this.

"This is the usual way that situations such as this are handled and teachers are kept from talking publicly. Now do you understand why teachers complain bitterly in private but refuse to talk or take a stand in public in opposition to the educator?

"The CTA has a 'long arm' and can permanently affect the job opportunity of any teacher.

"Mr. Greenleaf had talked with Howlett when he expressed, in this paper, compliments about the Forum of which I am a part.

"The appearance and activities of Mr. Howlett and Mr. Greenleaf demonstrate an interesting attitude toward the people of Susanville and the teachers of the Lassen High School and Junior College; neither knew that he was here.

"Who really owns and controls the local schools?

"Jack Ownes"

" '[March 18, 1959]    In my letters, I have taken the opposite and badly needed stand; here in Lassen County we have serious problems in education. These should be cured; it is more important to talk of the problems than to continue the bouquet-tossing game. After all, who would be interested in remedying anything that is already nearly

The final letter, also adjudged "unprofessional," was published on May 13, the same date that the charges were formulated against defendant by the board.[4]

---

perfect? If we don't see and cure our problems the Russians quite probably soon will; they also will cure us of the "liberty" habit. Certainly we cannot cure all the problems of education in the United States but let us at least do our share.

" 'Fourth, every issue is confused by fence sitters who insist that they see no reason to act. We have tried to knock down the fence and thus clarify the issue; local education either does or does not need changing. It is time to decide.

" 'Fifth, we have hoped to illustrate that the board, the public, and the teachers have all been isolated and cannot, under present conditions, communicate adequately; they cannot meet and discuss current issues in education. The educators have created, for their own interest, a strong wedge of distrust between these groups. Thus problems in education cannot be cured. Events during the past years, highlighted by the high school board and administration refusal to appear in the Forum, justify this viewpoint.

" 'Sixth, that administrators backed by large state organizations and the board-given authority to hire and fire have deprived the teacher of the dignity and security necessary for independence and adequate public responsibility.

" 'Finally, that the people here in Susanville and Lassen County have been unable to secure reasonable and badly wanted changes in their own educational system. Regardless of the law, the administration has the authority but escapes the responsibility; the boards have the responsibility but no real authority (the administration has that—it is on the job all the time and has effective control over the faculty), the public has tax bills and a mess but no control (the recent flurries in school meetings, curriculum construction, etc., are pacification gestures; something that will, it is thought, lull the public back to sleep).

" 'Where shall ge go from here? All interested people should come to the Forum Friday night and talk it over.' "

"'Wednesday, May 13, 1959  TUESDAY'S ELECTION  To the Editor:

"'The school boards in this area have been guilty of a practice that would be more fitting in Russia than in the United States; that of permitting or placing unlimited and unsupervised authority in the hands of the administration. This practice has cost the people of Lassen County untold sums of money, many excellent teachers, and it has deprived our children in most cases of an adequate school system. The price has been very high.

"'Boards have become little more than rubber stamps for administrators, their authority is simply being used. These administrators apparently use the board and its authority as they wish. After a few board sessions over the conference table board members see both the public and the teachers as enemies and are quite ready to rubber stamp the administrator's autocracy or one man rule.

"'The basis of administrative supremacy is (1.) He is on the job every day—the board member is there just once each month. (2.) He has with the board consent, a service staff to do research and to back him along with the CTA and other such administrative protective associations—the board member has no one.

"'If the people of this area want decent high school and Junior college education, I strongly urge that they elect the maximum number of new board members. Elect people who have the strength to be responsible to the public, then go to each board meeting and back the

It should be noted that one of the directors of the forum, who also had been a speaker at one of the sessions in the education series, was a successful candidate in the school board election alluded to in the letter of May 13.

Before discussing the additional evidence presented at the trial of this cause, primarily because we feel the trial court erred in its approach to this problem, we believe it necessary to discuss the concept of "unprofessional conduct."

Basically, the word "unprofessional" is a relative expression without technical meaning, and the phrase "unprofessional conduct" as used in the Education Code has been given no legislative definition. (*Board of Education* v. *Swan,* 41 Cal.2d 546 [261 P.2d 261].)

In the judicial determination of whether the precise facts presented constitute "unprofessional conduct" the trial courts enjoy a great deal of discretion. (*Board of Education* v. *Swan, supra,* 41 Cal.2d 546.) However, in exercising this discretion they are bound by the limits placed by the appellate courts upon the concept of the scope of "unprofessional conduct." Defendant, in effect, argues that one of those limits applicable to his case is his constitutional right to publicly criticize the educational process, including his superiors, without fear of losing his teaching position.

However, this is too broad a proposition, and has been answered by the California Supreme Court in this manner: "One employed in public service does not have a constitutional right to such employment and is subject to reasonable supervision and restriction . . . to the end that proper discipline may be maintained, and that activities among the employees may not be allowed to disrupt or impair the public service. [Citing cases.]" (*Board of Education* v. *Swan, supra,* 41 Cal.2d at p. 556.)

Thus, the trial court's primary inquiry in the present case where the sole basis of the charges were letters critical of education should have been to the questions of whether there had been any disruption or impairment of discipline or the teaching process as a result of defendant's letters.

persons you elect. Require that your board use the intelligence of everyone, teachers and public, to construct and use a basic curriculum of fundamentals—with the frills left out.

"One person rule in the schools has produced a mess and this should be changed.

"See you at the polls,

"Jack Owens,

"Susanville."

Instead, the trial proceedings and the findings comprise a meticulous attempt to establish that the statements in defendant's letters were "unwarranted" or "unsupported by the evidence." The result of this approach is that the court often ended up weighing its opinion against that expressed by defendant in his letters. The following excerpt from the findings is illustrative: "The court feels that there is nothing in the record to show any apparent deep concern, or concern of any kind, by the people of Lassen County over poor results of public education locally . . . because the record in this case abounds with irrefutable evidence that the junior college and the high school are functioning in a *proper* manner, have been and are obtaining good results and have good rating as such . . .

". . . . . . . . . . .

". . . the record shows that the junior college and high school . . . are being conducted, managed and *properly* handled, in a careful and *proper* manner . . ." (Italics added.)

It was not the court's function to debate the subject of *proper* administration of the school system. Within the limitations previously discussed (disruption or impairment of discipline or the teaching process), defendant had the constitutional right to differ with the court and the administrators over what is *proper* management, at least in a responsible manner.

Furthermore, as a matter of record, the only substantial evidence indicates that the people of Lassen County *had* expressed concern over the results of local education. For example, the board's letter of February 13 to defendant noted the "very great local interest" in the forum, petitions requesting the withdrawal of the superintendent were circulated by the public at the time of the forums, and a "reform" candidate who had defendant's backing was elected to the board. Since we have mentioned the comment of the board, we should also note the testimony of the principal of the high school that the median in one of the high school English classes was "way down" to 9, and that of 150 incoming freshmen, 14 were not tested in English because of their inability to read and "because we felt it was a waste of the test."

We will not further examine the court's findings, except to indicate that the evidence presented relevant to a properly framed inquiry, as delineated above, will not support the general finding of "unprofessional conduct." That small amount of relevant evidence revealed by the record is uncon-

tradicted. This dearth of pertinent information is partially due to plaintiff's predilection to excoriate defendant for his letters, and to effectually place the burden upon defendant to justify them. Plaintiff might more profitably have spent its time in attempting to establish what effect harmful to education in Lassen County had been engendered by the letters.

The uncontradicted evidence reveals that defendant violated no board or school policy by publicly airing his grievances; indeed, it appears that the board and school had no written grievance procedures. Neither did defendant violate any other ascertainable school rule.

There is no issue of disobedience or insubordination. (Cf. *Board of Education* v. *Swan*, 41 Cal.2d 546 [261 P.2d 261] and *Midway School Dist.* v. *Griffeath*, 29 Cal.2d 13 [172 P.2d 857].) As previously noted, the board made no direct demands upon, nor any contact with, defendant concerning the letters, except to decline his invitation to discuss the charges at the public forum lecture.

Furthermore, there is nothing in the facts presented to support plaintiff's sole contention on this appeal that the judgment finds "incontrovertible" support in the decisions of *Board of Education* v. *Swan*, 41 Cal.2d 546 [261 P.2d 261] and *Pranger* v. *Break*, 186 Cal.App.2d 551 [9 Cal.Rptr. 293].

The defendant in the *Swan* case repeatedly violated various school district rules, refused to accept teaching assignments, was insubordinate, refused to conform to the instructions and requirements of her superiors, continuously refused to attend required meetings, and told a Parent Teachers Association Meeting that when she had been called before the Los Angeles City Board of Education she had "spit in their faces." In addition, before a regularly scheduled meeting of the local Parent Teachers Association, defendant had made derogatory remarks concerning the superintendent of schools and criticized the board of education for bringing him to Los Angeles. The Supreme Court affirmed the trial court's finding of unprofessional conduct, and we agree. However, the case is in no way "uncontrovertible" support for the judgment in the present case which is based on completely dissimilar facts.

Nor is the *Pranger* case in any way controlling. That case involved the dismissal of a civil service employee for "conduct unbecoming a public employee." The basis for the dismissal was an editorial written by defendant, an employee of a county air pollution control board, which could be inter-

preted as sanctioning, and even advocating, a strike for higher pay. The court concluded that public employees have no right to strike against the government, absent legislative authority. In that context, defendant was advocating illegal action.

Defendant in the instant case is advocating the perfectly legal and laudatory "action" of public debate on vital issues, and in the letter of May 13, exhorts the people to vote in the school board election. These pleas bear no similarity to the advocacy which the court in the *Pranger* case labeled illegal.

Reference must be made to the evidence supporting the court's finding that defendant's conduct was "unethical and unbecoming a person in the profession of teaching." The question of ethics, although seemingly germane to this inquiry into "unprofessional conduct," suffers from a difficulty of definition. This unfortunate fact was reflected in the trial proceedings.

In response to questioning, defendant testified that prior to his resignation from the CTA on April 14, 1959, he generally subscribed to the association's recommended code of ethics, but since his resignation he subscribed to his own code of ethics. Other teachers, including the acting director at Lassen Junior College, testified that they followed their own personal code of ethics.

The record indicates that approximately 102,000 of the potential 120,000 teachers in the state belong to the CTA, but that they take no oath to support it, nor do they agree to subscribe to the CTA code of ethics when they join. The CTA code is in no way embodied in any California legislation.

Nevertheless, a report of a CTA professional ethics panel was introduced into evidence without opposition. Section 13417 of the Education Code, which seems to authorize this procedure, reads in part: "Upon any such trial [such as the case before us], the court or any party may call and examine expert witnesses to testify as to any matter of professional or personnel standards . . . or other such professional matters as may be involved in the subject matter at issue.

"    .    .    .    .    .    .    .    .    .    .    .

' "... the court may also receive and consider as evidence any report ... submitted by such expert witness ... or a panel . . . maintained by a statewide professional and educational association. . . ."

A CTA panel member testified that the panel believed defendant's conduct to violate the CTA code of ethics, and the panel's written report so deciding was filed with the court.

An examination of this report indicates that defendant's act of *publicly* criticizing the board's policy, once it had been established, was a prime factor in its decision. This is consistent with the uncontradicted testimony that the CTA representative had told defendant in January that the CTA could "never go along" with his letter-writing campaign (which merely urged public discussion).

It is clear that defendant, even while a member of the CTA neither subscribed to nor agreed with this part of the CTA code of ethics. It is likewise clear (from their testimony and conduct) that the several teachers who assisted in the preparation of the letters and in the administration of the public forums did not subscribe to this "maxim."

Nevertheless, the court concluded that defendant had ignored "all codes of professional ethics," when he chose to publicly criticize aspects of local education. This conclusion is not supported by the uncontradicted testimony mentioned above and thus, the investigation of ethical codes in the teaching profession was of little assistance.

However, this is not to say that the phraseology of defendant's letters can be looked upon as a model of scholarly clarity, nor that the somewhat intemperate language employed therein is commended to the teaching profession. But it is a matter of record that a great deal of public debate on the subject of education was occurring, both in California and nationwide, at the time of the Susanville public forums. It is not surprising that many of the arguments were not temperately phrased in terms of universal clarity, and that much of the logic employed was flavored by personal experience. ▮▮▮ Defendant, a father of school-age children, was not precluded from joining in this great public debate because of his status as a teacher. Nor was he precluded from criticizing education in the course of his electioneering in support of his choice of a candidate for the school board in the coming election. Furthermore, in the case before us, plaintiff had the opportunity to meet publicly with its protagonist for the purposes of clarification and rebuttal. However, the choice was to postpone this encounter until the trial of defendant on the charges presented.

At the trial, defendant's conduct of partially basing his opinions on material published in California newspapers was rejected by plaintiff as unsatisfactory evidence because it was

not "personal knowledge." Indeed, plaintiff required that defendant name any teacher expressing views similar to his, and bring the teacher into the trial to testify firsthand if he wished to rely upon his statement as "justification" for his opinions. Few teachers so designated were named by defendant and few appeared as witnesses. Considering the quasi-inquisitional nature of plaintiff's trial tactics and the fact that charges had been filed against defendant, it is not surprising that more of this "evidence" was not presented.

As we have previously indicated, plaintiff's and the court's exhaustive examination of the "evidence" to "warrant" defendant's statements (for example, in regard to "purposeful education," "injustice to the teacher," "autocracy" or "proper handling of the school system") was not a helpful approach to the problem of "unprofessional conduct."

The only scintilla of evidence bearing on the decisive issue raised by the facts of this case, whether defendant's conduct had resulted in an impairment of the teaching process or had raised disciplinary problems, is found in the CTA panel report previously mentioned. That report contains the following statement:

"The panel concludes that Mr. Owens' continued employment in this district is untenable and would lead only to embarrassment to himself and the district. The antagonism created by his actions has caused a rift, which if continued, would undermine the educational program to a degree which could not be compensated for even by effectiveness as a classroom teacher."

This statement is baldly set forth in the record without explanatory comment. Accordingly, the basis for the statement, the nature of the "rift," the "embarrassment," or the "undermining," are not before us. Nor was it before the trial court. It is not surprising then, that no mention of this aspect of the report was made by the court, nor were there any findings on the matter.

The flat prediction that the continued employment of defendant "would undermine the educational program" is similar to a charge levied against a school principal after a particularly acrimonious Florida school election campaign. The Florida Supreme Court answered: "This apprehension is necessarily speculative . . . [and] there is no logical reason now to determine that because of animosity growing out of the election the relator will inevitably be so recalcitrant that she should be excluded from a position of authority [as school

principal]." (*Adams* v. *State* (Fla.) 69 So.2d 309, 311.) This statement is most appropriate to the record we have examined in the present case.

On the basis of the record before us, and for the reasons above discussed, the judgment allowing dismissal because of "unprofessional conduct" is reversed.

Pierce, J., concurred.

SCHOTTKY, J.—I dissent.

Applying, as we must, the familiar rules governing an apellate tribunal, I am convinced that the record supports the trial court's finding of "unprofessional conduct."

As I view this matter, it resolves itself into a question of whether or not a member of the faculty of a school is justified in having published in the public press letters containing statements which can only have the result of undermining the confidence of the public in the character, efficiency and integrity of the school administration.

The several letters are included in the majority opinion. For the purposes of this dissent I think it is only necessary to quote excerpts from certain of the letters published by appellant.

In the letter of March 4, 1959, appellant wrote:

"To the Editor:

"The Lassen Union High School and Junior College administration and a part of the board of trustees have well illustrated a disease that is rapidly sinking American public education, California first, that of autocracy. These people have had and believe that they still have absolute and final authority over their 'empire,' the high school and junior college. That time is no more.

"They have created, mainly through ineptness and indifference, a mess obviously and primarily beneficial and desired only by themselves, if by anyone. They have created and permitted situations and conditions in those schools that does gross violence to the dignity and decency standards of many teachers and students. They have created and maintained a situation in which the possibility of reasonable education is seriously hampered. How can teachers teach and students learn under conditions distasteful and shameful to both?"

In the letter of March 18, 1959, appellant stated: ". . . If we don't see and cure our problems the Russians quite probably soon will; they also will cure us of the 'liberty' habit."

In the letter of May 13, 1959, appellant stated: "The school boards in this area have been guilty of a practice that would be more fitting in Russia than in the United States; that of permitting or placing unlimited and unsupervised authority in the hands of the administration. This practice has cost the people of Lassen County untold sums of money, many excellent teachers, and it has deprived our children in most cases of an adequate school system. The price has been very high!

"Boards have become little more than rubber stamps for administrators, their authority is simply being used. These administrators apparently use the board and its authority as they wish. . . ."

The majority seeks to justify the letters of appellant upon the ground that while the language used was "somewhat intemperate," appellant should not be precluded from joining in the great public debate on the subject of education. They state: "However, this is not to say that the phraseology of defendant's letters can be looked upon as a model of scholarly clarity, nor that the somewhat intemperate language employed therein is commended to the teaching profession. But it is a matter of record that a great deal of public debate on the subject of education was occurring, both in California and nationwide, at the time of the Susanville public forums. It is not surprising that many of the arguments were not temperately phrased in terms of universal clarity, and that much of the logic employed was flavored by personal experience. Defendant, a father of school-age children, was not precluded from joining in this great public debate because of his status as a teacher."

The above quotations are from only a few of a series of letters written by appellant in what can only be construed as a persistent campaign to undermine public confidence in the administrator and administration of the school in which he was a member of the faculty.

The majority appears to believe that the right of free speech and public debate is involved in this case, but, as I view the matter, the issue is not the right of freedom of speech but is rather whether the publication of such statements by a member of the school faculty was under the circumstances unprofessional conduct.

In 44 California Jurisprudence 2d 217, it is stated: "The fact that the provision authorizing dismissal of a permanent employee for unprofessional conduct does not define that phrase does not render it void for uncertainty. 'Unprofes-

sional conduct' is a relative expression without technical meaning or arbitrary connotation. It is a phrase to be construed according to its commonly approved usage, having regard for the context in which the legislature uses it. It designates conduct that violates the rules or the ethical code of a profession or that is unbecoming a member of a profession in good standing.''

In *Board of Education* v. *Swan,* 41 Cal.2d 546 [261 P.2d 261], it is said at page 553: ''The phrase 'unprofessional conduct,' as used in the Education Code, is to be construed according to its common and approved usage, having regard for the context in which the Legislature used it. (Ed. Code, § 10; 23 Cal.Jur., § 122, p. 745.) The word 'unprofessional' is a relative expression without technical meaning or arbitrary connotation. 'Unprofessional conduct' is defined in 66 Corpus Juris, p. 55, as 'that which violates the rules or ethical code of a profession or such conduct which is unbecoming a member of a profession in good standing.' ''

As stated in the majority opinion, the record indicates that approximately 102,000 of the 120,000 teachers in the state belong to the California Teachers Association which maintains a commission on personnel standards. As contemplated and authorized by section 13533.5 (now § 13417) of the Education Code the respondent board of trustees requested that this commission appoint a panel of the commission to report on the professional matters involved in appellant's case. The panel was appointed, made a study, and submitted a report which was offered and received in evidence at the trial without objection. The report of the panel summarizes the facts of appellant's case, in a manner substantially in agreement with the facts as subsequently found by the trial court, and then states the ''considered professional judgment'' of the panel as follows: ''The panel does not consider it unethical or insubordinate to oppose the administration, even vigorously, during discussion preceding the adoption of policy. Neither would it be considered unethical to continue to utilize democratic procedures within professional channels in an effort to revise earlier decisions. However, pressing a personal viewpoint in an intemperate manner which manifests disregard or contempt for the opinion or status of a colleague, or which disrupts effective democratic procedures, is not acting in a professional manner.''

The report concludes as follows: ''The panel's summary conclusion is that Mr. Owens' letters to the editor, published

in the local paper, constitute a persistent breach of professional ethics, and represent unprofessional conduct.

"In addition, the nature of Mr. Owens' criticisms concerning the educational system in his district and his method of airing them publicly have seriously alienated his colleagues, the Board of Trustees and the administration.

"The panel concludes that Mr. Owens' continued employment in this district is untenable and would lead only to embarrassment to himself and the district. The antagonism created by his actions has caused a rift, which if continued, would undermine the educational program to a degree which could not be compensated for even by effectiveness as a classroom teacher."

Section 13417 of the Education Code reads in part as follows: "Upon any such trial [such as the case before us], the court or any party may call and examine expert witnesses to testify as to any matter of professional or personnel standards . . ., or other such professional matters as may be involved in the subject matter at issue. . . .

". . . . . . . . . . .

" [T]he court may also receive and consider as evidence any report . . . submitted by such expert witness . . ., or a panel . . ., maintained by a statewide professional and educational association . . ."

It is clear, therefore, that the court was entitled to consider the written report of the panel in weighing and determining the issue of unprofessional conduct.

The trial of the instant case lasted 14 days and the reporter's transcript occupied 953 pages. It was tried before an able and experienced judge from an adjoining mountain county who filed an exhaustive "DECISION, FINDINGS AND CONCLUSIONS" in which he reviewed the evidence. I am satisfied that the record amply supports the findings and conclusions of the trial court and particularly the following:

"The Court feels that there is nothing in the record to show any apparent deep concern, or concern of any kind, by the people of Lassen County over poor results of public education locally, or within the Lassen Union High School, wherein is located the junior college of which Mr. Owens is one of the teachers, because the record in this case abounds with irrefutable evidence that the junior college and the high school are functioning in a proper manner, have been and are obtaining good results and have good rating as such, and as heretofore stated, are accredited to the higher institutions of learning

in the State of California. And said statement would appear to the Court as being unfounded and unsupported by the evidence, unbecoming and unethical from a person engaged in the profession of teaching, and especially one who is a member of the faculty of the junior college in the Lassen Union High School District.

"..........................

". . . If anything was materially wrong in the college or its operation, he knew the place to go for correction and the proper procedures to follow, to take, for any needed change that might or could be made for the good and benefit of the college. He knew the Board of Trustees was the executive and the administrative head of the school. They were ready and willing to listen to anyone or any committee desiring to present any matter of concern for the improvement or benefit of the college. The board changed its regular meeting time from daytime to evening, to make it more convenient for anyone who had a legitimate school matter to present, to afford them the opportunity to do so.

"Instead of going before the governing board in a proper manner for any needed changes or reform in the junior college, of which Mr. Owens was a teacher and thereby a part and parcel of the school system of the Lassen Union High School District, he, ignoring all codes of professional ethics and the proper legal and orderly channels and processes for handling and conducting our public schools in California, chose to criticize and publicly condemn, unjustly and unfairly, from the evidence in this case, the Board of Trustees, the administration, the superintendent and, in fact, all personnel connected with said junior college, of which he is and was a tenure teacher, which said letters so published, as heretofore referred to in said findings, constituted unprofessional conduct on the part of Mr. Jack Owens."

I believe the judgment is supported by the decision of our Supreme Court in *Board of Education* v. *Swan, supra*. The *Swan* case, like this case, involved an appeal from a judgment authorizing the dismissal of a permanent teacher under the tenure law. The trial court had found that, among other things, appellant had "made derogatory statements concerning the superintendent of schools and criticized the board of education for bringing him to Los Angeles" (p. 549) and during the course of a Parent Teachers Association meeting had "called the superintendent of schools and other

school administrators 'henchmen' and the board of education office 'The Little Kremlin.' '' (P. 550.)

In affirming the judgment the Supreme Court answered the constitutional argument urged by appellant here as follows: ''Nor can defendant prevail in her claim that affirmance of her dismissal infringes upon the constitutional guarantee of her freedom of speech, in that she thereby is denied the right to criticize her superiors upon pain of losing her position. (U. S. Const., amends. I and XIV; Cal. Const., art. 1, § 9.) One employed in public service does not have a constitutional right to such employment and is subject to reasonable supervision and restriction by the authorized governmental body or officer to the end that proper discipline may be maintained, and that activities among the employees may not be allowed to disrupt or impair the public service. (*Christal* v. *Police Com.,* 33 Cal.App.2d 564, 569 [92 P.2d 416]; *City of Los Angeles* v. *Los Angeles Bldg. & Constr. Trades Council,* 94 Cal.App.2d 36, 48-49 [210 P.2d 305].) Because of this dominant public interest, the exercise of such control over the public employee is not only a right but is a duty, and in the discharge thereof a wide discretion is allowed, which will not be disturbed until the point of illegality is reached. (*Hayman* v. *City of Los Angeles,* 17 Cal.App.2d 674, 679 [62 P.2d 1047].) '' (P. 556.)

In the recent case of *Pranger* v. *Break,* 186 Cal.App.2d 551 [9 Cal.Rptr. 293], which involved dismissal of a civil service employee for ''conduct unbecoming a public employee,'' the court in discussing the claimed violation of the right of free speech said at page 555:

''The issue is not the right of freedom of speech, whether petitioner had the right to make such editorial statements, or whether such statements were of the nature which presented a clear and present danger, but the real issue is whether the publication of the statement, under the circumstances and in view of petitioner's position as a public employee in a sensitive governmental office, was, *ipso facto,* conduct unbecoming a public employee. This question is fairly well treated in *Hayman* v. *City of Los Angeles,* 17 Cal.App.2d 674, 679 [62 P.2d 1047] (hearing denied by the Supreme Court) where it is said:

'' 'The right which is involved here is not that which petitioner thinks has been denied him, but is the right of respondents to exercise a reasonable supervision over city employees, to the end that proper discipline may be main-

tained and that activities among employees be not allowed to disrupt or impair the public service. Such is not only the right but the duty of the city and its several departments. In the exercise of this duty, they must be allowed a wide discretion and their acts are not subject to review by the courts until they have reached the point of illegality. . . . If petitioner's activities had a tendency to create dissension and unrest among the city employees and to interfere with the enforcement of reasonable rules of conduct prescribed by the Board of Public Works, it is not for the courts to declare that a dismissal based upon these facts would be without cause and therefore without authority under the charter of the city.' ''

Lassen County is a mountain county with a population of less than 14,000. The Lassen Advocate is published in Susanville, the county seat, with a population of approximately 5,000. As this court said in *Cote* v. *Rogers,* 201 Cal.App.2d 138, 145 [19 Cal.Rptr. 767]: ''. . . It probably could be said that it is a matter of common knowledge that the smaller the community the greater the prominence and importance of newspaper stories which name or refer to persons residing in the area served.'' We would be naive indeed not to assume that the letters written by appellant and published in the Advocate were not read by a great many people in Lassen County and that appellant intended that they should be read. As hereinbefore set forth, and as found by the trial court, the letters contained statements which were not merely ''somewhat intemperate,'' as stated by the majority, and which reflected upon the character, efficiency and integrity of the school administration, but which were found by the court to have no proper foundation in fact. To hold that a teacher who is himself a member of the faculty of the school can carry on such a persistent campaign to undermine public confidence in the administrator and administration of the school and not be guilty of unprofessional conduct according to the ethics and standards of the teaching profession would, in my opinion, be detrimental to our educational system. The teachers of California have the benefit and protection of a good system of permanent tenure which amply protects them against unjust and improper dismissal, but it was never intended that tenure should excuse or justify conduct such as that of appellant in the instant case. A teacher who is a member of the faculty of a school district owes it to the school that is employing him to endeavor to advance the interest of

the school and its students. Instead, appellant pursued a course of conduct that could not benefit either the school or its students. As stated in the findings of the trial court, and amply supported by the record, "Instead of going before the governing board in a proper manner for any needed changes or reform in the junior college, of which Mr. Owens was a teacher and thereby a part and parcel of the school system of the Lassen Union High School District, he, ignoring all codes of professional ethics and the proper legal and orderly channels and processes for handling and conducting our public schools in California, chose to criticize and publicly condemn, unjustly and unfairly, from the evidence in this case, the Board of Trustees, the administration, the superintendent and, in fact, all personnel connected with said junior college, of which he is and was a tenure teacher, which said letters so published, as heretofore referred to in said findings, constituted unprofessional conduct on the part of Mr. Jack Owens."

In view of the foregoing, it is my conclusion that the finding of the trial court that appellant was guilty of unprofessional conduct is supported by the evidence, the law, and sound public policy. I would affirm the judgment.

A petition for a rehearing was denied August 20, 1962. Schottky, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied September 26, 1962. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.