[Civ. No. 11397. Third Dist. Dec. 26, 1967.]

OLEN HOLLON, Plaintiff and Appellant, v. KELLY V. PIERCE, as Trustee, etc., et al., Defendants and Respondents.

Marshall W. Krause, Leep, Saunders & Halpin and Robert H. Laws, Jr., for Plaintiff and Appellant.

Jere E. Hurley, Jr., for Defendants and Respondents.

FRIEDMAN, J.—Petitioner Olen Hollon sought mandate in the trial court to compel reinstatement by his employer, Shasta Union High School District, alleging that the district had discharged him because of his religious beliefs. After a hearing in which evidence was taken and findings were made, the trial court denied the petition. Hollon appeals.

Hollon had been employed by the school district since 1960, first as a bus driver, then as transportation superintendent. In the latter capacity he supervised the operation of 26 school buses, doing some relief driving himself and transporting students to special events. Performance reports rated him as "capable, efficient, reliable, a good leader." He was employed on an annual contract, renewable July 1st of each year.

About June 19, 1964, a printed religious tract entitled *The "Upper Room" of Babylon* came to the attention of the school district authorities. Hollon's brother-in-law was the author of the tract, but Hollon's name was printed on the front cover, as though he were one of the two authors. Description in limited space of the tone and content of *The "Upper Room" of Babylon* is difficult. In general, the theme is the corruption of modern society and its imminent destruction. There are many numerological references. The elect, that is, those not infected by the general corruption, are referred to as "END TIME PEOPLE" and "#7 MINDS." The corrupt are designated as "#6" or "#666 minds."[1] There are violent denunciations of various Christian churches and denominations, also condemnations of named public officials and candidates for public office. Passages in the minor prophets and Book of Revelation are interpreted in highly colored, eschatological terms. Some sample passages are reproduced in the margin.[2]

---

[1] The beneficent significance of the number 7 is illustrated in Revelation 5.6 and 8.2. The evil significance of number 666 appears in Revelation 13.18.

[2] "HOLY WRITE [*sic*] TELLS US THAT ON THE DAY OF PENTECOST THERE SUDDENLY CAME THE SOUND OF A RUSHING MIGHTY 'WIND' AND IT FILLED ALL THE BELIEVERS IN THE 'UPPER ROOM' WITH THE SPIRIT OF THE ETERNAL AND THEY SPAKE WITH OTHER TONGUES (AND TONGUES OF FIRE) AS THE SPIRIT GAVE UTTERANCE." (P. 3.)

"And mighty . . . they're mighty alright. Mighty men of BABYLON. And they're mighty drunk on HER WINE. And they're mighty sick on

After examining the booklet, the superintendent and the assistant superintendent of the school district interviewed Hollon, its apparent coauthor, questioning his emotional stability and his fitness to drive a school bus. Hollon stated that

that BIG DRUNK. And there is going to be a mighty lot of them in HELL. Yes sir, they been on HER #6 TRACK so long it'd be mighty hard for them to change over onto that #7 TRACK at this late hour. And they may finish FIRST in BABYLON, but brother, they going to finish mighty late in God's BOOK. Looks like they'll hit the finishing wire about the same TIME the world of Noah hit it.'' (P. 3.)

''NUTS AND BOLTS AND TIN CANS AND MONSTERS H-BOMBS AND STRIPES IN TOOTHPASTE AND DEATH AND DESTRUCTION OF GOD'S UNIVERSITY BEAUTY TO DAMNABLE SICK PERVERTED #MINDS.'' (P. 7.)

''Here in California the TENSION and WIND OF BABYLON is so strong you can almost reach out and cut it with a knife. It has SNUFFED out the LIFE and LIGHTS of the CHILDREN of MEN. This FIRE of APOSTASY is so great it is like some eating flaming dragon. Always eating . . . chewing away . . . consuming these poor creatures. Family and home life is FAR REMOVED FROM IT. God and Truth and the WORD and Gospel has been devoured by this BABYLON WIND.'' (P. 9.)

''. . . *What shall we say in the light of these things??? Every church, every school, every factory will have to be burned. And the sooner the better. Unless . . .*

''THE APOSTASY CREATED CHRIST OF BABYLON

''The CHRIST this clergy preaches is a stranger to the BIBLE. He is no where taught in the WORD. He is a FALSE IMAGE of #666 MAN. He is THE CHRIST OF APOSTASY. Thus an ANTI-CHRIST. And this clergy is a FALSE PROPHET.'' (Italics added.) (P. 27.)

''*It would be a real bad sin for a man to take a machine gun down here in one of these schools and just shoot to death a school house full of these little children.* That's real bad to your #666 Minds way of thinking. And I'm not saying it wouldn't be bad. But I'm going to tell you something right now. Its hardly a clergyman in America, or on the earth today that does not commit a worse sin EVERY DAY.'' (Italics added.) (P. 50.)

''. . . All most every pulpit and pew filled with an anti-christ, and bub, you branded of the damned are going to get Rev. 11: all the way. Some of you who have drew close to this work and turned away . . . your children are going to die for it. Now you just watch and see.'' (Italics added.) (P. 140.)

''SEX BABYLON STYLE

''Here in California (and most other states) the professional man is said to have 10-30 women on the ready at all times. The young man has a steady. Then for sex reasons has 1-4 girls on the side. Some times pregency [sic] by such girls (many times purposefully[)] ruin such a set up. They feel the least a girl can give here is sex, for they know she is far removed from divine love. They expect and demand it. Let's see, how do they say it. Pounce on me. She is ready to pounce on me. I'm going to pounce on him. Pervertness of sex is common. I could clear most church halls by just repeating talk from you[r] dear little youngsters. In all the states on the union it is little different. Its a bastard WIND all the way.'' (P. 142.)

''The Laodicea Apostasy closed forever the open door God set before the Philadelphia church period. The SIX DIMENSION is a closed door with no 'OUT' but the #666 Bastard 'OUT' of the WHORE CHURCH and SPACE PROGRAM. The saints and nonconformist are consumed outright . . . martyred in the Dragon Fire of Babylon. The SIX DIMENSION even

the book represented his beliefs, that he had helped with the preparation of it, that he was now being crucified and was ready to die for the cause. They requested that he submit to an evaluation by a clinical psychologist in the district's employ. Through his attorney, Hollon refused examination by the district's own employee, but offered to submit to an examination by a private psychiatrist at his own expense. The school district psychologist was asked to examine *The "Upper Room" of Babylon.* He informed the superintendent that the book exhibited paranoiac tendencies which called for further investigation; that a diagnosis on the basis of the book alone was not possible. The superintendent notified Hollon that the question of renewal of his contract for the year commencing July 1, 1964, would be considered at a meeting of the district trustees on June 23, 1964, and that he might appear.

On the advice of his attorney Hollon did not attend the meeting. The school board held no formal hearing, but considered the question of contract renewal in executive session.[3] The district superintendent and assistant superintendent, together with the board members, examined a copy of *The "Upper Room" of Babylon.* Because Hollon's name was one of two names printed on the front cover, they believed him to be a coauthor. Excerpts from the book were read. According to the later testimony of one of the board members, the trustees took note of the virulent attacks on society and on named public officials, its expressions of violence and hatred, its threats of widespread death and destruction. Hollon's personnel file was reviewed. It mentioned earlier incidents in which Hollon had indulged in emotional outbursts. An administrative investigation of a school bus accident in 1963 had resulted in a finding of his contributory negligence, and this finding aroused an emotional outburst. At another time, after the discharge of one of the district bus drivers, Hollon had become quite emotional, almost incoherent, and had offered to resign. He had also "flared up" over the rerouting of a bus. Although these incidents had not occasioned much concern at the time, Hollon's apparent coauthorship of *The*

'removes God from it.' This Evil has clean brainwashed the Six Dimension and man of #666 Babylon. It is force conformity to man else one cannot buy and sell. It even denies birthright or freedom of choice." (Italics added.) (P. 185.)

[3]Government Code section 54953 requires school boards and other agencies to hold public meetings. Government Code section 54957 permits an executive session during a meeting to consider the appointment, employment or dismissal of an employee.

*"Upper Room"* of *Babylon* now caused the trustees to view them as symptoms of emotional instability. They concluded that they did not wish to entrust the safety of school children to Hollon.

Following the executive session, the board adopted a resolution withholding renewal of Hollon's contract for the forthcoming school year but offering to review any psychiatric examination he might obtain. Hollon then filed a complaint with the State Fair Employment Practice Commission (Lab. Code, § 1414), which conducted an investigation. He submitted to examination by two psychiatrists, whose reports were furnished to the commission and by the commission to the school district. Neither of these psychiatrists found him to be maladjusted, disoriented, psychotic or dangerous.

The psychiatric reports were considered by the school board at its meeting of July 28, 1964. At this second meeting the trustees were aware that Hollon had not actually written any of *The "Upper Room" of Babylon,* but that he was responsible for its publication and distribution. Also in the board's hands was a small classified newspaper advertisement in which he had offered *The "Upper Room" of Babylon* for sale to "high school children" at a price of $5. The board declined to reconsider its action.

After some correspondence with the school district, including a recommendation that the district reemploy Hollon, the State Fair Employment Practice Commission appears to have dropped the matter. A description of the proceeding's status is described in a commission document dated January 5, 1965, as follows: "Case is being held open pending civil action." Actually, no civil action had been filed. The present action was commenced in May 1965. Relative to the proceeding before the State Fair Employment Practice Commission, the petition alleges that in November 1964 a letter from the commission had informed Hollon: "Your file is now in the hands of our attorney for recommendation as to the next step. I will be in touch with you as things develop." The petition further alleges that in March 1955 Hollon learned that the State Fair Employment Practice Commission contemplated no further action. This allegation is not controverted.

In the superior court hearing the district superintendent, the assistant superintendent and one of the trustees testified that the contents of *The "Upper Room" of Babylon* led them to believe that Hollon was emotionally unstable and not to be trusted with the safety of school children. Hollon testified

that he was not actually an author of *The "Upper Room" of Babylon*; that his printed name on the pamphlet cover did signify his belief in the contents; that it did represent a "basic picture" of his own faith. The trial court found that the school district "had reasonable cause to believe, and honestly did believe, that [Hollon] might be mentally unbalanced;" that its decision not to reemploy him was based solely upon this belief.

At the request of this court counsel have briefed the question of exhaustion of administrative remedies. Our concern was aroused because Hollon had filed a complaint with the State Fair Employment Practice Commission, which initiated but did not complete proceedings. Where an administrative remedy is provided by statute, relief must be sought from the administrative body and the remedy exhausted before the courts will act; a court violating the rule acts in excess of jurisdiction. (*City of Susanville* v. *Lee C. Hess Co.*, 45 Cal.2d 684, 689 [290 P.2d 520]; *Abelleira* v. *District Court of Appeal*, 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715].)

 A statute investing a public agency with continuing supervisory or investigatory power affords an "administrative remedy" when it establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties. (*Rosenfield* v. *Malcolm*, 65 Cal.2d 559, 565-566 [55 Cal.Rptr. 505, 421 P.2d 607].) The California Fair Employment Practice Act (Lab. Code, §§ 1410-1432) establishes such machinery. The term "employer" includes public agencies of the state. (*Ibid.*, § 1413.) The act empowers the State Fair Employment Practice Commission to receive, investigate and pass upon complaints alleging discrimination in employment because of religious creed. (§ 1419.) It declares that discharge of an employee because of religion is an unlawful employment practice. (§ 1420.) When a complaint alleging an unlawful employment practice is filed with the commission, it is directed to make an investigation, to attempt correction by conciliation and, if unsuccessful, to initiate a formal hearing. (§§ 1421, 1427.) The commission's final orders are subject to judicial review. (§ 1428.) The commission may seek injunctive relief to restrain violation of a final order. (§ 1429.)

 Hollon had filed an administrative complaint alleging facts which, if true, constituted an unfair employment practice. At that point the commission was directed by law to

conduct an investigation. (Lab. Code, §§ 1421, 1423.) It had, so to speak, jurisdiction to determine its own jurisdiction, even though the allegation of an unfair employment practice might ultimately prove unfounded. Before seeking judicial review, Hollon had to exhaust the administrative remedy he had invoked. (Cf. *San Diego Gas & Elec. Co.* v. *San Diego Congress of Racial Equality*, 241 Cal.App.2d 405, 408-409 [50 Cal.Rptr. 638].)

He contends that he did so and we agree. Although the FEPC proceeding did not reach the point of completion by rejection of the complaint or rendition of a final order, it did come to a complete halt. The commission's records, in evidence in the trial court, contain several copies of communications to the school district offering conciliation; a somewhat vehement refusal by a spokesman for the district; other documents signifying that the commission would take no further action "pending civil action." The administrative machinery had stopped. Theoretically, the complaining employee might have brought a mandate proceeding with the objective of compelling commission action. (See *Bess* v. *Park*, 132 Cal. App.2d 49, 55 [281 P.2d 556].) Such a lawsuit would entail expense and delay. The rule of initial resort to the administrative agency demands exhaustion of the remedy, not attrition of the litigant. It is not an inflexible dogma. The authorities recognize a number of circumstances tantamount to exhaustion, for example, where the agency's jurisdiction is "merely colorable" or where it indulges in unreasonable delay. (*Deering Milliken, Inc.* v. *Johnston*, 295 F.2d 856, 865-866; *Allegheny Airlines, Inc.* v. *Fowler*, 261 F.Supp. 508, 517-518; *Ward* v. *Keenan*, 3 N.J. 298 [70 A.2d 77]; 3 Davis, Administrative Law Treatise (1958) § 20.03, p. 69; Jaffe, *The Exhaustion of Administrative Remedies*, 12 Buffalo L.Rev. 327, 335-338; see also *Joint Anti-Fascist Refugee Com.* v. *McGrath*, 341 U.S. 123, 156 [95 L.Ed. 817, 845, 71 S.Ct. 624], concurring opinion of Frankfurter, J.) The present litigant did not bypass the administrative remedy in an attempt to buy time or desert it in fear of defeat. The State Fair Employment Practice Commission had only colorable jurisdiction since, as we view the matter, the discharge was not a manifestation of religious bias. Its machinery was supplying no practical benefit in terms of job restoration. Under the circumstances, petitioner adequately complied with the rule of exhaustion.

Hollon contends that his discharge stemmed from a

constitutionally forbidden inquiry into the truth or falsity of his religious beliefs. (See *United States* v. *Ballard,* 322 U.S. 78 [88 L.Ed. 1148, 64 S.Ct. 882] ; *People* v. *Woody,* 61 Cal.2d 716, 726 [40 Cal.Rptr. 69, 394 P.2d 813] ; *Estate of Supple,* 247 Cal.App.2d 410, 414 [55 Cal.Rptr. 542].) The religio-constitutional issue is not dispositive. The question before the school board was the employee's fitness for a position entailing supervision of a bus system transporting public school students and availability as a bus driver. Both the Legislature and the State Board of Education have manifested concern for the safe condition of school buses and the qualifications of their operators. (Ed. Code, §§ 16851-16865; Veh. Code, §§ 2807, 12516; Cal. Admin. Code, tit. 5, §§ 1060-1162.) School officials would be remiss if they were not vigorous in seeing to the reliability and emotional stability of such an employee. They would be remiss if overt displays of irrationality did not arouse inquiry and possible removal from the job. Irrationality takes many outward forms. Mental aberrations just as readily assume a religious guise as not. That an aberration is expressed in religious terms does not foreclose good faith inquiry into the aberration itself. Such an inquiry by those responsible for the employee's fitness is not an invasion of his private religious beliefs. ▌ A nondiscriminatory regulation of conduct for a proper public objective is not forbidden by the guarantee of free belief even though the regulation indirectly affects religious activity. (*Cantwell* v. *Connecticut,* 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352] ; *Perez* v. *Sharp,* 32 Cal.2d 711, 713 [198 P.2d 17].) ▌ Certainly, an investigation of competence would not be tolerated if it cloaked a prohibited inquiry into unorthodox belief or an act of religious bias. Good faith plays a role. The trial court found that the school board honestly believed that Hollon might be mentally unbalanced; that its decision was based solely on that belief. There is no lack of evidence to support the finding of honest belief.

▌ An investigation and penalty so prompted exact an inevitable price by tending to constrict free expression, religious or otherwise. There are limited circumstances in which the government, as an employer, may impose conditions upon its employees despite a resulting qualification of constitutional rights. (*Bagley* v. *Washington Township Hospital Dist.,* 65 Cal.2d 499, 505 [55 Cal.Rptr. 401, 421 P.2d 409].) Not only must the conditions reasonably tend to further the purposes of the employment, ''but also the utility of imposing

the conditions must manifestly outweigh any resulting impairment of constitutional rights." (*Ibid.*, p. 506; see also *Goldberg* v. *Regents of the University of California,* 248 Cal.App.2d 867, 877 [57 Cal.Rptr. 463].) The discharge of a school bus driver who, upon adequate evidence, cannot be trusted with the safety of his passengers is aimed at fulfillment of the school agency's public obligations. The utility of the action outweighs its tendency to restrict the bus driver's freedom of belief and expression. Thus, for all practical purposes, the unimpeached finding that the employer honestly believed the employee to be unfit forecloses any claim of constitutional trespass.

 Although a public employee has no constitutional right to his position, he cannot be barred or removed arbitrarily. (*Fort* v. *Civil Service Com.,* 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P.2d 385], and cases cited; see also *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d at pp. 503-505.) The school district does not claim authority to terminate Hollon's employment arbitrarily or at pleasure.[4] Action is arbitrary not only when it is capricious, but when it lacks substantial support in the evidence, when the facts do not reasonably justify the conclusion. (*McDonough* v. *Goodcell,* 13 Cal.2d 741, 747 [91 P.2d 1035, 123 A.L.R. 1205]; *Riley* v. *Chambers,* 181 Cal. 589, 595 [185 P. 855, 8 A.L.R. 418]; *Dierssen* v. *Civil Service Com.,* 43 Cal.App.2d 53, 63-64 [110 P.2d 513]; see *Stanton* v. *Dumke,* 64 Cal.2d 199, 205 [49 Cal.Rptr. 380, 411 P.2d 108]; 2 Am.Jur.2d, Administrative Law, §§ 452, 683.) The focal point of review here is arbitrariness, not religious discrimination.

 The trial court properly found reasonable justification for the school board's action. In a sense the board had arrived at a layman's diagnosis of a psychological condition, a diagnosis with which professional opinion might (and did) disagree. The trustees, nevertheless, bore ultimate responsibility for the safe transportation of students. At their meeting of June 23, 1964, the trustees were confronted with a choice of action approximately one week before the July 1 renewal date of Hollon's annual contract. They believed him to be one of

---

[4] At oral argument, counsel for the school district declared that under the district's employment practices, Hollon was a permanent employee, entitled to renewal of his annual contract except "for cause." (See Ed. Code, § 13583, preceding its 1965 amendment; *Hamilton* v. *Stockton Unified School Dist.,* 245 Cal.App.2d 944 [54 Cal.Rptr. 463]; *California School Emp. Assn.* v. *Willits Unified School Dist.,* 243 Cal.App.2d 776 [52 Cal.Rptr. 765].)

the two authors of *The "Upper Room" of Babylon.* He chose not to appear to disabuse them of that belief and to meet the challenge of his fitness. Not only did *The "Upper Room" of Babylon* express threats, violence and retribution, it had several specific references to the burning of schools and the death of school children. (See italicized passages, fn. 2, *supra.*) Such expressions could reasonably cast a new light on earlier incidents in which a measure of emotional instability had appeared. However metaphorical, these expressions could not but create some fear of a sudden pathological outburst at a time when the employee was transporting school children. In deference to his past services, the trustees might have chosen to defer action pending psychiatric inquiries and diagnoses. To defer action would have brought the board past the July 1 contract renewal date and might have imperiled the board's power to take any action at all. (*California School Emp. Assn.* v. *Willits Unified School Dist., supra,* 243 Cal. App.2d at pp. 785-786; see fn. 4, *supra.*) To defer action conceivably entailed a gamble with the safety of school bus passengers. The board chose immediate action, throwing the burden upon the employee to seek renewal of his status. The court cannot say that the board's fears had no foundation in reason or that its action was arbitrary.

█ Reconsideration of Hollon's status at the board meeting of July 28, 1964, might be characterized as a new application by a former employee or, alternatively, as an extension of the earlier proceeding. The latter characterization seems more appropriate. At this point the trustees knew that Hollon was a sponsor rather than author of the book and that he had advertised its sale specifically to high school children. It also had the benefit of professional diagnoses which found no danger in the man. Nevertheless, the trustees rather than the psychiatrists had the ultimate responsibility for safety. Even in the light of their revised knowledge, their apprehensions were not baseless and their action not arbitrary.

Judgment affirmed.

Pierce, P. J., and Janes, J. pro tem.,* concurred.

A petition for a rehearing was denied January 23, 1968, and appellant's petition for a hearing by the Supreme Court was denied February 21, 1968.

---

*Assigned by the Chairman of the Judicial Council.