[L.A. No. 30074. In Bank. Sept. 13, 1973.]

HALVOR GERALD ADCOCK, Plaintiff and Respondent, v.
BOARD OF EDUCATION OF THE SAN DIEGO UNIFIED SCHOOL
DISTRICT et al., Defendants and Appellants.

## COUNSEL

Thomas A. Shannon and Ralph D. Stern for Defendants and Appellants.

Levy & Van Bourg and Howard L. Berman for Plaintiff and Respondent.

Harold F. Tyvoll as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**THE COURT.**—Defendant Board of Education of the San Diego Unified School District (hereinafter "board") and its secretary, Jack Hornback, appeal from a judgment granting a peremptory writ of mandate. The writ directs the board to set aside its administrative decision transferring Halvor Gerald Adcock (hereinafter "Adcock") from Clairemont High School to another school, and further ordering the board to reinstate Adcock to his former position, that of a tenured teacher of social studies at Clairemont.

For the reasons explained below, we conclude that the trial court was correct not only in making an independent assessment of the record but also in determining that the reason for the transfer was the disapproval by the school administration of Adcock's exercise of First Amendment rights and in concluding that the subsequent transfer was not justified by any compelling state interest.

Adcock taught social studies at Clairemont from 1958 until June 1969.

Clairemont is a senior high school located within the San Diego Unified School District, providing instruction for grades 10 through 12. In June 1969, the principal of the school submitted a written memorandum requesting Adcock's transfer to another school because of his criticism of certain school policies and regulations and the effects of the criticism on school staff and parents. The criticisms related to the dress and grooming code, the outside speaker policy, and the administration's refusal to permit publication of a second student newspaper.[1] The request was granted, and Adcock was reassigned to Roosevelt Junior High School where he taught seventh grade classes during the 1969-1970 school year.

On Adcock's appeal to the board, a hearing was conducted by a state hearing officer of the California Office of Administrative Procedure substantially in accordance with the hearing procedures set forth in the Administrative Procedure Act, section 11500 et seq. of the Government Code. After seven days of hearing which included the testimony of some 30 witnesses, the hearing officer submitted a proposed decision finding the transfer discriminatory and a misuse of delegated authority, and ordering Adcock reinstated at Clairemont High School.[2] The board unanimously declined

---

[1] In an inter-office memorandum to the assistant superintendent of schools, the principal gave the following five reasons for the transfer:

"1. In contacts with students and parents he has been openly critical of certain school and district rules and regulations such as the dress and grooming code and the outside speaker policy. This has tended to undermine the authority of teachers, administrators and parents.

"2. He has demonstrated an unwillingness to accept administrative directives. For example, following a decision of the Superintendent not to permit publication of the 'Open Mind' newspaper, Mr. Adcock and some of the students continued to pursue the issue on campus, in the press and on television rather than to work toward the alternative proposals suggested.

"3. At the weekly Open Forum meetings involving parents, students, and staff members, Mr. Adcock has utilized a considerable portion of the time to criticize school policies related to dress and grooming standards, outside speakers and the 'Open Mind' publication. This has resulted in a number of complaints from parents.

"4. An increasing number of parents have requested the school not to enroll their children in Mr. Adcock's classes or to have them withdrawn from class. The reasons given represent considerable disagreement with the social and political points of view advocated by Mr. Adcock and the lack of balance and fairness in the handling of controversial issues in the classroom.

"5. Mr. Adcock's actions and attitudes have caused dissent and unrest among a growing percentage of staff members and parents. As a result a disproportionate amount of the counselors' time and the principal's time must be devoted to the issues and the problems raised."

[2] The hearing officer's findings include a summary of the evidence in the record. They may be summarized as follows: 1. Adcock's criticism: Adcock was openly critical of the outside speaker policy, the dress and grooming code, and the administration's refusal to permit publication of a second student newspaper to be called the "Open Mind." He sincerely believed that the position taken by the district and school

to adopt the proposed decision. Instead, acting pursuant to section 11517, subdivision (c), of the Government Code,[3] it reviewed the record of the hearing without taking additional evidence and afforded each party the opportunity to submit additional written argument.[4]

authorities should be changed. He was never abusive. He was not overly loud or offensive. Above all, he was never ordered to desist. Furthermore, most of his criticism was made at convocations of parents, teachers, and students, sponsored by the school, which were called "Open Forums" and existed for the purpose of open discussion of subjects in which the school was concerned. It is not true that the open criticism tended to undermine the authority of teachers, the administration or parents. On the contrary, the debates led by Adcock tended to add to the educational maturity of the students.

2. Unwillingness to accept administrative directives: At no time did he actually violate any policy, rule or regulation of the school or of the district, nor at any time did he invite, advocate or tolerate their infraction by any student. He was never ordered or even requested to cease pursuing the subjects, nor was he threatened with transfer or discipline if he did not cease.

3. Utilization of time at open forum meetings: The chair was authorized to rule on any motion to suppress a speaker, but no one ever protested his right to speak in these meetings, or requested him to desist.

4. Parental request to remove children from his classes: Two or three parents withdrew their children from his classes during the 1968-1969 school year. Twenty-one other parents of students who might have been assigned to his class wrote the principal expressing the desire to have some other teacher instruct their children. The complaints of these parents stemmed predominantly from political and philosophical beliefs at poles opposite to those held by Adcock. There is no proof that Adcock dealt with controversial issues in a distorted manner in the classroom or in other than a fair and reasonable approach.

5. Dissidence: Differing views in the school, and division of opinion on the staff was undoubtedly of concern to the principal and his administrative staff, yet there was insufficient proof that it consumed a disproportionate amount of his or his staff's time.

The hearing officer also found that an important incident underlying the transfer was an incident which apparently was not mentioned in the principal's memorandum. In the spring of 1968 Adcock and another teacher from Clairemont Higs School distributed handbills in the vicinity of other high schools in the district. These handbills listed the legally acceptable alternatives to the draft, and other means which could have been used to avoid the draft. The handbill mentioned the criminal penalties involved in the use of any illegal means but in no way advocated either legal or illegal activity.

The hearing officer found that the distribution of these handbills created a storm of objection among certain parents and teachers of Clairemont High School, and that the school's principal in requesting Adcock's transfer, was actuated significantly, if not principally, by the more vociferous of this group of teachers and parents.

[3]Section 11517, subdivision (c), provides in part: "If the proposed decision is not adopted as provided in subdivision (b), the agency itself may decide the case upon the record, including the transcript, with or without taking additional evdence, . . . The agency itself shall decide no case provided for in this subdivision without affording the parties the opportunity to present either oral or written argument before the agency itself."

[4]The additional argument submitted by the school district's counsel essentially maintained that the First Amendment should not be extended to the instant case, and that the transfer was made entirely in good faith.

The board's findings can be summarized as follows: Adcock's open and persistent criticism of rules and policies tended to undermine the authority of teachers, the administration and parents. He spoke out against administrative directives. His attitudes alienated some of his fellow teachers, administrators, and many parents. This divisiveness became a matter of concern to the principal and his administrative staff because it affected faculty morale and community attitudes toward the school. Adcock was never told to desist nor told that if he persisted he would be transferred to another school. The board made no finding concerning the distribution of handbills.

The board concluded that Adcock's transfer was not discriminatory and did not involve a misuse of delegated authority. It approved the transfer. However, the board ordered Adcock transferred to a position of equivalent rank and grade, found that the transfer to a junior high school was not such a transfer and transferred him to another high school within the district.

Adcock petitioned the superior court for a writ of mandamus. (Gov. Code, § 11523; Code Civ. Proc., § 1094.5; *Griggs* v. *Board of Trustees,* 61 Cal.2d 93, 96 [37 Cal.Rptr. 194, 389 P.2d 722].) The case was submitted on the record before the hearing officer without additional evidence. The court issued the writ of mandamus concluding that the transfer was made as a means of, and with the effective result of, denying Adcock his First Amendment freedoms.

■ It is settled that a teacher's right to speak is constitutionally protected as long as it does not result in any disruption, or impairment of discipline or materially interfere with school activities. (*Tinker* v. *Des Moines School Dist.,* 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]; *Pickering* v. *Board of Education,* 391 U.S. 563 [20 L.Ed.2d 811, 88 S.Ct. 1731]; *Keyishian* v. *Board of Regents,* 385 U.S. 589 [17 L.Ed.2d 629, 87 S.Ct. 675]; *Bekiaris* v. *Board of Education,* 6 Cal.3d 575 [100 Cal. Rptr. 16, 493 P.2d 480]; *L. A. Teachers Union* v. *L. A. City Bd. of Ed.,* 71 Cal.2d 551 [78 Cal.Rptr. 723, 455 P.2d 827]; *Board of Trustees* v. *Owens,* 206 Cal.App.2d 147 [23 Cal.Rptr. 710]; see also Note, *Developments in the Law—Academic Freedom* (1968) 81 Harv.L.Rev. 1045, 1071-1075; Van Alstyne, *Constitutional Rights of Teachers and Professors* (1970) Duke L.J. 841.)

■ Although the "substantial evidence" rule has been held to be applicable to determinations of local administrative boards, it has been essential to adopt a special rule or standard to review administrative decisions

when constitutional rights are assertedly limited. (*Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575, 586-587; *Bixby* v. *Pierno,* 4 Cal.3d 130, 140-141 [93 Cal.Rptr. 234, 481 P.2d 242].) As no party to this action has challenged the continued vitality of the "substantial evidence" standard of review in most determinations of local administrative boards, we have no occasion herein to reexamine the same.

In order to retain the ultimate responsibility for insuring that constitutional rights not be abridged in the absence of a sufficient compelling public interest, the special rule referred to above requires that the trial court must make an independent assessment of the established factual elements to determine whether the true reason for the board's action was the exercise of constitutional rights and, if so, whether the resulting limitation on the exercise of these rights can be justified by any compelling state interest. On appeal from the decision of the trial court, the appellate court must uphold the trial court's determination as to the basis of the administrative action if supported by substantial evidence. (*Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575, 590 et seq.; *L. A. Teachers Union* v. *L. A. City Bd. of Ed., supra,* 71 Cal.2d 551, 557.)

In *Bekiaris* we held that the special standard applies when it is claimed that the administrative action in dismissing an employee was based on official dissatisfaction with the exercise of constitutional rights. This rule is not designed to protect the employee's employment rights but is intended to protect the employee's freedom to exercise First Amendment rights. Accordingly, it has been applied in cases where the employee had no tenure or civil service rights and where the employee could have been dismissed for no reason whatsoever. (*Rosenfield* v. *Malcolm,* 65 Cal.2d 559, 564 [55 Cal.Rptr. 505, 421 P.2d 697]; *Bagley* v. *Washington Township Hospital Dist.,* 65 Cal.2d 499, 504 [55 Cal.Rptr. 401, 421 P.2d 409]; *Stanton* v. *Dumke,* 64 Cal.2d 199, 207 [49 Cal.Rptr. 380, 411 P.2d 108]; see also *Hollon* v. *Pierce,* 257 Cal.App.2d 468, 476-478 [64 Cal.Rptr. 808].) Because the rule was established in order to protect constitutional rights and not employment rights, it must apply not only to dismissals but also to all administrative sanctions based on conduct protected by the First Amendment.

Any sanction imposed for the exercise of protected First Amendment conduct must be viewed as having a chilling effect on speech and on the right of teachers to engage in those activities which are protected by the First Amendment. Lesser penalties than dismissal can effectively silence teachers and compel them to forego exercise of the rights guaranteed them by our Constitution.

Thus in *Finot* v. *Pasadena City Bd. of Education,* 250 Cal.App.2d 189 [58 Cal.Rptr. 520], a transfer was invalidated because it had been based upon activity of a teacher related to exercise of First Amendment rights. There, a high school teacher was transferred from his classroom assignment to home teaching though his pay and rank remained the same. The court held that even though he could have been assigned to any teaching duty for which he was qualified and for which he was needed (Ed. Code, § § 931, 939, subd. (c)), his right to engage in such activity was constitutionally protected, and that his transfer from one assignment to another because of the exercise of his constitutional rights violated those rights and constituted a legally remediable detriment.

We concede that the superintendent obviously has and must have very broad discretion in transferring teachers from one school to another, i.e., when it in fact "is in the best interest of the district" (Ed. Code, § 939, subd. (c)), and his discretion ordinarily will not be reviewed or interfered with by the trial court. It is *only* when it is asserted that the motivation for transfer is based on a teacher's exercise of constitutionally protected rights that the trial court will conduct an independent review of the record to determine whether the assertion is true.

The United States Supreme Court has emphasized that "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools" (*Shelton* v. *Tucker,* 364 U.S. 479, 487 [5 L.Ed.2d 231, 236, 81 S.Ct. 247]). It is the classroom and academic institutions which are the marketplace of ideas and where the exchange of ideas and arguments are to be fostered, not curtailed (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 512 [21 L.Ed.2d 731, 740-741]).

In *Tinker* the court also stated: "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk [citation]; and our history says that it is this sort of hazardous freedom—this kind of openness —that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

"In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the

discomfort and unpleasantness that always accompany an unpopular view-point." (*Tinker* v. *Des Moines Schol Dist., supra,* 393 U.S. 503, 508-509 [21 L.Ed.2d 731, 739].)

It is true that the more serious and disturbing allegation against Adcock is the claim that his conduct resulted in disharmony among the faculty and resentment from parents. Yet as *Tinker* and *L. A. Teachers* clearly point out disharmony from speech is a natural by-product and any limitation or penalty imposed in the name of prevention of disharmony is an attack on speech. Furthermore, both decisions hold that disharmony is not a sufficient state interest to compel restrictions on First Amendment activity or to penalize a teacher for exercising First Amendment freedoms. ■ Mere fear of disruption due to the expression of unpopular views will not justify interference with the free expression of opinion. (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 508-509.)

■ In the absence of actual disruption, any kind of administrative discipline for the content of speech is improper, where, as here, the un-popular views are uttered in forums designed for the airing of different views on controversial issues and where, as here, the views are uttered in a polite but forceful manner.

In balancing the important right of school authorities to administer the system efficiently, effectively and without internal antagonistic factors, the court must look carefully into both the dynamics of why the administrative action was taken and the inherent effect of taking it if that effect is also a part of the cause. Priorities place constitutional rights above unlimited administrative authority to act in their derogation. Disharmony and friction are the healthy but natural results of a society which cherishes the right to speak freely on a subject and these resultant by-products should never prevent an individual from speaking or cause that individual to be penalized for such speech. Any attempt to do so abrogates the protections that the First Amendment affords to all.

It should be pointed out that the penalty invoked against Adcock arose in part out of his speeches at the Open Forum at Clairemont. To help meet the growing unrest at Clairemont, school officials created an Open Forum as an outlet for expression of ideas of pressing interest which students, teachers, parents or the administration, felt needed resolution and which would be exposed to open discussion from all sides.

To create a forum for free and open discussion of the problems vitally affecting the institution and its members and then to penalize a participant who assumes the sincerity of purpose in its creation and therefore freely

participates, particularly in the absence of any objection to the nature of his participation at the time, is akin to entrapment. ■ To invite teachers to openly discuss with parents, students and the administration the subjects logically before the forum and then to charge them with being uncooperative, obstructive and offensive to the administration, to other teachers and to parents because they argue their positions with vigor and at length is arbitrary and capricious administrative conduct, even in the absence of constitutional considerations. The dilemma is further exacerbated when no showing is made that such speeches disrupted classrooms, teaching efficiency, or in any way led to a potentially dangerous situation at the school.

■ Adcock's speech did not pose a threat to interests of the school district which would justify a speech limitation. So far as appears from the record, all of his criticisms were made at a proper time and in an appropriate place and manner. His speech which resulted in friction was not speech that occurred in the classroom or that affected or interfered with his teaching. On the contrary, it is undisputed that Adcock was an unusually effective teacher. He obeyed the rules he was working to change, his criticism was directed toward accomplishing change, and he encouraged utilizing existing means for effecting change.

We conclude that the reason for the transfer in question was the exercise of protected First Amendment activity. That conclusion can be reached either by using traditional guidelines regarding judicial review of administrative decisions or by the application of independent review accorded those decisions which place an individual's constitutional rights in jeopardy or which as in the instant case impose sanctions upon the individual for the exercise of those rights. The record clearly sustains the findings of the trial court.

The judgment is affirmed.

**CLARK, J.**—I concur, though reluctantly.

True, while a public employee serving at the pleasure of his employer may be dismissed for slight cause, he may not be discharged or demoted for exercise of a constitutional right absent a compelling governmental interest. (*Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771 [97 Cal. Rptr. 657, 489 P.2d 537]; *Finot* v. *Pasadena City Bd. of Education* (1967) 250 Cal.App.2d 189 [58 Cal.Rptr. 520].) Likewise, since substantial evidence supports the trial court's finding that Adcock's transfer occurred in large part because of his exercise of First Amendment rights, we are bound by that finding under *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575 [100 Cal.Rptr. 16, 493 P.2d 480].

My reluctance stems from the majority's subsilentio extension of the first premise to this case.

All the cases of which I am aware resting on the principle for which *Bogacki* and *Finot* are cited above involve dismissal from public employment (see, e.g., *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575; *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559 [55 Cal.Rptr. 505, 421 P.2d 697]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409]; *Ball* v. *City Council* (1967) 252 Cal.App.2d 136 [60 Cal.Rptr. 139]; see also *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385]) or transfer tantamount to demotion (*Finot* v. *Pasadena City Bd. of Education, supra,* 250 Cal.App.2d 189). The majority's apparent dependence on that rule imports into this case the assumption, perhaps warranted where dismissal or demotion is concerned but not fully warranted here, that the challenged administrative action is essentially punitive. However, where as here a transfer involves no demotion, loss of status, or diminution in pay, it is at least as reasonable to conclude, absent evidence to the contrary, it was made for some legitimate managerial reason as for an impermissible punitive one. While I concede the record discloses sufficient evidence to justify a finding of punitive motive, it also reveals evidence the board was motivated by several sound reasons for effecting a transfer.

Reassuring upset parents is a time-consuming and taxing duty for school administrators. Dissension among the faculty poses serious problems affecting efficient operation of the schools. The possibility of student disorders was particularly threatening when this case arose; anything which might undermine already shaken respect for the authority of parents and teachers could reasonably be feared as encouraging such a result. Were it less clear the board harbored an improper purpose (and more clear the dangers feared by the board had materialized, a point I touch on below), these reasons would, in my view, have justified Adcock's transfer.

A second difference between dismissal and transfer warrants comment. Termination of an employee constitutes radical surgery. Demotion is likewise a drastic measure. In contrast, lateral transfer without loss of rights, status, or pay is a far more moderate action, with far less impact on the exercise of protected rights. Indeed, the spirit of restraint shown here should be encouraged.

Finally, if school administrators are to be charged with efficient management of their schools, they should be given authority commensurate with that responsibility. If they are not allowed to meet potential problems (as

apparently they are not; see *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]), they should at least be permitted to remedy the consequences of exercise of protected rights by the Adcocks of this world once those consequences have occurred. As I have suggested, the evidence that the anticipated effects of Adcock's outspokenness had actually begun to make themselves felt is not particularly strong and probably not sufficient to distinguish this case from *Tinker.* But the rule apparently relied on by the majority fails to make allowance for even minimal remedial powers and, for that reason, its wisdom is open to question.

In short, I would soften the impact of the *Bogacki* principle in circumstances such as those presented here. Where the public employer acts for legitimate managerial reasons, where it acts with restraint and in response to actual rather than anticipated problems, and where the impact of its action on protected freedoms is both indirect and slight, something less than a compelling governmental interest should be required in justification of the action. My comments above indicate this suggested rule was probably not met here; hence this concurrence. But the majority opinion appears unwisely to extend a rule developed in far more serious cases to one so different in degree as to be different in kind.

**McCOMB, J.**—I dissent. I would reverse the judgment for the reasons expressed by Mr. Justice Ault in the opinion prepared by him for the Court of Appeal in *Adcock* v. *Board of Education of San Diego U. Sch. Dist.* (Cal.App.) 103 Cal.Rptr. 633.