[Civ. No. 59994. Second Dist., Div. Four. June 17, 1981.]

MINORU SHIMOYAMA, Plaintiff and Appellant, v.
BOARD OF EDUCATION OF THE LOS ANGELES UNIFIED
SCHOOL DISTRICT et al., Defendants and Respondents.

COUNSEL

Kenneth R. Petrello for Plaintiff and Appellant.

John H. Larson, County Counsel, and Steven J. Carnevale, Deputy County Counsel, for Defendants and Respondents.

OPINION

FOSTER, J.*—Plaintiff, Minoru Shimoyama, was denied reassignment for the 1979 season to the position of head football coach at Chatsworth High School. He sued the Los Angeles Unified School District and Ted Siegel, the high school principal, for a declaration that he is entitled to continue in that position and for an injunction against removing him from it. From an adverse judgment, he appeals.

Defendant district allocates to high schools a number of "supplemental assignments" in extracurricular activities, such as coaching team sports, in which teachers may participate in addition to their regular teaching assignments. For performing these duties they receive extra compensation. Any interested and qualified teacher may apply, but it is the responsibility of the principal to select the person to fill the position.

At Chatsworth High School, supplemental assignments are limited in duration to the school year. Each spring, assignments for the next school year are reviewed, but ordinarily an individual is reassigned to his current position.

Shimoyama is a permanent teacher and since 1966 has been employed at Chatsworth High School. He has regular teaching assignments in biology and physical education, but each year from 1970 through 1978 he has held supplemental assignments as head football coach. He was also coach of the track team for the 1979 spring semester. For each of these positions he received $1,299 per semester in addition to his regular teaching salary.

On June 22, Shimoyama was called to a meeting with Siegel and Reno Lorenz, the assistant principal. The discussion was summarized by Siegel in a memorandum sent to Shimoyama the next day, with copies to Lorenz and to the school file. Siegel expressed concern that a decision by Shimoyama to purchase new football jerseys involving "a relatively major change in team colors was made without involvement" of Siegel, the assistant principal or the athletic director, and with the method of funding the purchase, in part by a "jog-a-thon" at the school with unused money to go to a fund other than the student body fund. Siegel deplored the lack of communication between Shimoyama and the administration, suggesting that "problems could be avoided by involving

---

*Assigned by the Chairperson of the Judicial Council.

us in activities early—preferably during the planning stages." For the future Shimoyama was directed to the school's athletic handbook for procedures in purchasing sports equipment, handling funds collected in school activities, and using school facilities in fund raising activities. Shimoyama was invited to "drop me a note" if his recollection of the conference differed from the memorandum, and "it will be attached to a copy of this memo."

On June 28, 1978, Shimoyama responded with a strongly worded letter. Much of it was devoted to challenging the accuracy of Siegel's description of the uniform acquisition plan and emphasizing Shimoyama's contributions to the football program at the school. But it also included a number of direct or implicit personal attacks upon Siegel. It began with a demand in future conferences to have a legal representative or a witness present, "especially if both you and Mr. Lorenz are there to back each other up." It accused Siegel of "twisting" or exaggerating the facts and charged that "[n]ow you have changed your story."

In another part of the letter, Shimoyama stated: "You say that you support athletics at Chatsworth High ... but I really don't know of One Coach who believes you support athletics. If you really support athletics, you have a funny way of showing it. Most coaches believe you tolerate it, but not really support it." It continued: "If you want to talk to me about spirit and morale, maybe a little introspection on your part might be recommended. As I've said, I've been teaching for 15-1/2 years and I've never seen the morale of a faculty lower than it's been for the last three years! In fact, every other principal that I've been under has had the respect of at least some members of the faculty."

At the bottom of the letter were a request that "one copy of this letter be placed in my file" and an indication that carbon copies were being sent to the district area superintendent, the head of the Chatsworth High School Booster Club, the school's faculty representative, two teachers active in United Teachers of Los Angeles (U.T.L.A.), the assistant football coach, "Varsity Football Team Leaders," and U.T.L.A. Shimoyama did not in fact send letters to the two named teachers, because he did not have their addresses, and changed his mind about sending copies to the student leaders of the football team.

Siegel testified that he found the letter offensive, that it contained inaccuracies and untrue personal attacks upon him, and that Shimoyama had inappropriately taken what had been a discussion between the two

of them and broadcast it. It was a very poor effort on Shimoyama's part to improve communications between the two of them, since it took a conference dealing with the subject of ordering and paying for jerseys and "went far, far afield from that."

On August 23, 1978, Siegel again met with Shimoyama and reviewed the letter with him. He told Shimoyama that he had read it many times and had lost a lot of sleep over it. Because of its nature, he said, he could no longer work with Shimoyama as the football coach at Chatsworth High School, and because Shimoyama had sent copies to other people, it was incumbent upon him to do something about it. He then handed Shimoyama a copy of a letter advising Shimoyama that he had reviewed his own memorandum and Shimoyama's letter and had concluded that his efforts to improve communications had proven fruitless. The letter informed Shimoyama that he would not be assigned to the position of varsity football coach for the 1978-1979 school year.

Shimoyama was given the option of agreeing to resign the football coaching position at the end of the current season, of being terminated immediately, or of proposing an acceptable alternative. Initially, he elected to resign at the end of the season. But later he and his attorney met with Siegel and an alternative plan was agreed upon. Shimoyama would send a letter retracting statements made in the June 28 letter and apologize, he would continue as head coach for the 1978 season, and in the interim Siegel would make a reevaluation to determine if Shimoyama's deficiencies had been corrected.

On November 22 or 23, Siegel and Shimoyama again met. Siegel informed him that he was not being reassigned as head football coach for the 1979 season and handed him a letter confirming that decision. Shimoyama continued to perform his football coaching duties for the remainder of the fall semester and his duties as track coach for the spring. His regular teaching assignments were not affected.

Siegel testified that his decision not to reassign Shimoyama as football coach for 1979 was made after close of the 1978 football season. He gave as reasons a lack of communication between Shimoyama and himself, a lessening of team morale, and a series of incidents over the four years of their association. In one, Shimoyama had knowingly used a player ineligible under the rules in a practice game. During a regular game, he had lost his temper and grabbed the face masks of players as they came off the field. In one game, the football team had been penal-

ized twice because of Shimoyama's arguing with the referee. Spectators had complained of Shimoyama's use of profanity. He continually ordered materials without going through recommended and requested procedures.

After the August 23 conference, there had been additional incidents. Shimoyama had made another purchase of equipment outside normal purchasing channels. During halftime of a soccer game when the soccer coach had priority in the use of the football field, Shimoyama sent some football players onto the field to practice kicking field goals. When the soccer coach waved them off, Shimoyama waved them back on, which led to a strong protest from the soccer coach. Two assistant coaches and several football players had approached Siegel with complaints of dissention among the coaching staff, and a low level of team morale.

When asked by plaintiff's attorney: "Isn't it a fact that Mr. Shimoyama's letter of June 28, 1978, was a factor in your decision not to reappoint him as football coach after the 1978 football season?", Siegel replied: "In the final analysis, it was one factor." He was later asked: "Can you say whether or not you would have made the same decision, had plaintiff's 2, the June 28 letter from Mr. Shimoyama to you, never been written?" His answer was, "I think I would have terminated Mr. Shimoyama's assignment whether or not that June 28 letter had been written to me."

On appeal, Shimoyama contends that failure to reappoint him to the football coaching position for 1979 was in retaliation for the exercise of a First Amendment right and denies him due process and equal protection of the laws. A second contention is that the trial judge committed prejudicial error in admitting hearsay evidence. Finally, he argues that refusing him reassignment without a hearing and without guidelines controlling exercise of the principal's discretion deprives him of due process.

The action was tried by a judge without a jury, jury trial having been waived. Findings of fact and conclusions of law were waived by plaintiff's failure to make timely request for them. (Cal. Rules of Court, rule 232.) ■ "Our role in the absence of findings is laid out in *Price* v. *Price* (1952) 114 Cal.App.2d 176, 179 [249 P.2d 841]; 'the appellate court will not weigh the evidence to determine what is true and what is not, but will assume that the trial court found every fact essential to support the judgment, and will search the record for the purpose only of

determining whether there is substantial evidence supporting the judgment and will resolve all doubts in favor of the judgment. [Citation.]'" (*Golde* v. *Fox* (1979) 98 Cal.App.3d 167, 174 [159 Cal.Rptr. 864].)

■ It is an established principle that a teacher may not be denied a position in retaliation for his exercise of a First Amendment right. (*Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 281 [50 L.Ed.2d 471, 480, 97 S.Ct. 568]; *Givhan* v. *Western Line Consol. School Dist.* (1979) 439 U.S. 410, 412 [58 L.Ed.2d 619, 622-623, 99 S.Ct. 693]; *Adcock* v. *Board of Education* (1973) 10 Cal.3d 60, 65 [155 Cal.Rptr. 596, 513 P.2d 900]; *Finot* v. *Pasadena City Bd. of Education* (1967) 250 Cal.App.2d 189, 202-203 [58 Cal.Rptr. 520].) The principle protects a teacher from loss of a position although he has no contractual or statutory right of tenure. As stated by the United States Supreme Court: "Doyle's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, *Board of Regents* v. *Roth*, 408 U.S. 564 (1972), he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." (*Mt. Healthy City Board of Ed.* v. *Doyle, supra*, 429 U.S. at pp. 283-284 [50 L.Ed.2d at p. 481].)

■ Shimoyama points to testimony of Siegel that the June 28, 1979, letter was a "factor" in his decision not to renew Shimoyama's coaching assignment. He contends that he is protected from loss of the position if Siegel's decision was only "partially" in retaliation for the exercise of a First Amendment right.

*Mt. Healthy* states a three-part test for determining whether a teacher has been deprived of a position because of his exercise of a constitutional right. The teacher has the burden of proving (1) that his conduct was constitutionally protected, and (2) that it was a motivating factor in the decision of the employer not to renew his assignment. The employer may negate legal causation by showing by a preponderance of evidence (3) that it would have reached the same decision in the absence of the protected conduct. (*Mt. Healthy City Board of Ed.* v. *Doyle, supra*, at pp. 286-287 [50 L.Ed.2d at pp. 483-484].) "But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because

the protected conduct makes the employer more certain of the correctness of its decision." (*Mt. Healthy City Board of Ed.* v. *Doyle, supra,* at p. 286 [50 L.Ed.2d at p. 483].) The record supports an implied finding adverse to appellant as to each of these issues.

Whether a teacher's conduct receives the protection of the First Amendment depends upon a balancing process. "[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 568 [20 L.Ed.2d 811, 88 S.Ct. 1731].)

Contrary to respondent's suggestion, the test is not whether the teacher's statements are made publicly or privately, for his private conversations with a superior may receive constitutional protection. (*Givhan* v. *Western Line Consol. School Dist., supra,* 439 U.S at p. 415 [58 L.Ed.2d at p. 624].) But the public or private nature of the teacher's statements may impact in differing ways upon the employment relationship. As *Givhan* points out: "4. Although the First Amendment's protection of government employees extends to private as well as public expression, striking the *Pickering* balance in each context may involve different considerations. When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they 'in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally.' *Id.,* at 572-573. Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." (439 U.S. at p. 415, fn. 4; italics in original.)

Shimoyama's brief provides little analysis of this issue. He points only to Siegel's testimony, that the June 28 letter was a factor in his decision not to renew the assignment, and seems to assume that because it

is in writing, that fact of itself is sufficient to guaranty constitutional protection.

The letter was written in the circumstance of a supervisor reprimanding a subordinate for deficiencies in the performance of his duties. Siegel's memorandum invited Shimoyama to give his recollection of the conference which he was free to do. But his response included a series of personal attacks upon Siegel, published to persons having no direct interest in them, which the trial judge could find were made by Shimoyama solely to vent his anger against Siegel and not for any purpose relevant to the issues under discussion.

Speaking of an analogous problem in a case involving the disciplining of a police officer for publishing a letter critical of his immediate superior, the court in *Unruh* v. *City Council* (1978) 78 Cal.App.3d 18, 24 [143 Cal.Rptr. 870], said: "Thus, whether the restriction on speaking out is permissible depends upon a weighing of the ambient facts and circumstances surrounding each case. The permutations of those facts and circumstances may on balance tip the scale one way or the other. (See *Pickering* v. *Board of Education, supra,* 391 U.S. at pp. 569-572 [20 L.Ed.2d at pp. 817-819]; *Arnett* v. *Kennedy* (1974) 416 U.S. 134 [40 L.Ed.2d 15, 94 S.Ct. 1633].) One significant consideration is whether the employee's criticism is 'at a proper time and in an appropriate place and manner.' (*Adcock* v. *Board of Education* (1973) 10 Cal.3d 60, 69 [109 Cal.Rptr. 676, 513 P.2d 900].) Significant state interests which must be considered are: maintaining proper employer-employee relations (see *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d at p. 508 [55 Cal.Rptr. 401, 421 P.2d 409]); whether the person involved is in a direct working relationship with the person affected by the publications, the effect on efficiency and harmony, the need for loyalty and confidentiality, and the effect on discipline (see *Pickering* v. *Board of Education, supra,* 391 U.S. at pp. 568-570 [20 L.Ed.2d at pp. 817-818]) ...."

Although discussions among the faculty of a high school no doubt permit a greater flexibility of expression than the paramilitary atmosphere of a police department, still the necessities of harmonious working relationships and employee discipline are the same. When, as here, the object of a teacher's attacks is his immediate superior, the threat to harmony and discipline is inevitable. If attacks upon a superior such as here were given constitutional protection, it would require a hardy administrator indeed to maintain a working relationship and to

risk criticizing a subordinate's performance, knowing that the subordinate was free with impunity to retaliate by broadcasting accusations implying that the administrator was a conspirator, a liar and a hypocrite. We hold that such expressions do not enjoy constitutional protection from discipline.

The letter was three and one-half pages long, single spaced, and covered several topics. Undoubtedly, Shimoyama's discussions of several of the topics were within the area of constitutional protection. From the imprecise testimony of Siegel that the letter was "a factor" in his decision, the inference might be drawn that the letter's protected areas of speech were a motivating factor in his decision. But the evidence does not compel such finding as a matter of law. Siegel testified that he was concerned because of the personal attacks upon himself and that attempts to improve communication had proven fruitless. The trial judge could find that these areas of the letter were the only ones bearing upon his decision.

The trial judge could also accept Siegel's testimony that he thought he would have made the same decision had the letter not been sent. Such implied finding supports defendants' position under the third test of *Mt. Healthy* that any connection between the letter and Siegel's decision did not meet the requirement of legal causation.

Shimoyama argues that Siegel's testimony concerning what decision he would have made had the letter not been sent is prejudicial hearsay. No objection upon this ground was made in the trial court, and were the objection a proper one it would be waived by the failure to make it. (Evid. Code, § 353, subd. (a).) But the complete answer to this contention is that the evidence was not hearsay. (See Evid. Code, § 1200, subd. (a).) The question did not call for a statement other than by a witness while testifying at the hearing; it called for Siegel's testimony as a witness of a past event, his prior state of mind, a matter directly in issue under *Mt. Healthy*.

 Finally, Shimoyama contends that he was denied due process of law because the district delegates to the individual high school principal, in his sole discretion, the decision of "hiring or firing" a football coach. He argues that a person may devote his whole life and career to being a football coach, can be highly successful and professional, and have his career terminated because of a personality dispute with the principal. "There are no guidelines, there are no prior hearings afford-

ed, there is no opportunity presented for any athletic coach to defend any allegations made against him."

It is commonplace in California's system of government, from the office of the Governor to its lowest echelons, to entrust to those in executive and administrative positions the responsibility of appointment and dismissal, subject to review only by the electorate or their administrative superiors. Appellant presents no authority, decisional, legislative or constitutional, why high school athletic coaches should be placed in a different category.

Whether a person is entitled to a hearing before renewal to a position may be denied depends upon the existence of a property right in such position. In its absence, both the United States Supreme Court (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 560-561, 92 S.Ct. 2701]) and the Supreme Court of California (*Barthuli* v. *Board of Trustees* (1977) 19 Cal.3d 717, 722-723 [139 Cal.Rptr. 627, 566 P.2d 261]) have rejected the claim of a right to a hearing. Although appellant cites with approval the opinion of Mr. Justice Marshall dissenting in *Roth*, this court is not at liberty to depart from the holdings of the highest courts of the country and this state.

Shimoyama seeks to analogize the circumstances of his nonrenewal to those cases which require a hearing before an employee may be deprived of a liberty interest, such as when nonrenewal is based upon charges which affect his "good name, reputation, honor or integrity" or when the employer has imposed upon him a stigma or other disability which forecloses his freedom to take advantage of other employment opportunities. (See cases collected in *Board of Regents* v. *Roth, supra*, 408 U.S. at pp. 573-574 [33 L.Ed.2d at pp. 558-559].) Thus, he argues, he was subject to the stigma of being "fired" as football coach and to newspaper stories concerning the dismissal which injured his reputation.

A liberty hearing, however, does not provide an employee with review of the issue of whether he may be removed from a nontenured position. It affords him only "an opportunity to clear his name." (*Board of Regents* v. *Roth, supra*, 408 U.S. at p. 573 [33 L.Ed.2d at p. 558]; *Codd* v. *Velger* (1977) 429 U.S. 624, 627 [51 L.Ed.2d 92, 96, 97 S.Ct. 882]; *Zumwalt* v. *Trustees of Cal. State Colleges* (1973) 33 Cal.App.3d 665, 680 [109 Cal.Rptr. 344].)

There is nothing in the record to show that Shimoyama has ever sought a hearing for that purpose. Neither in his pleadings nor in briefs filed in the trial court did he ever seek relief other than reinstatement to the position of head football coach. Even on the appeal, he urges only that "the trial court should be reversed and appellant herein reinstated as head football coach at Chatsworth High School." Under these circumstances, we do not consider as properly before us the issue of whether Shimoyama should be afforded a hearing on the loss of a liberty interest.[1] We hold that the trial judge correctly denied to plaintiff a declaration that he is entitled to be reinstated as head football coach and an injunction against removing him from that position.

The judgment is affirmed.

Files, P. J., and Woods, J., concurred.

---

[1] It is not clear from appellant's brief whether he is claiming the right to a liberty hearing or simply arguing that circumstances analogous to a liberty interest should compel this court to reexamine the rule of *Roth* and *Barthuli* which we decline to do.